Kirkpatrick, J.*
This is an information in nature of a quo warranto, filed in the term of May, 1802, by the attorney-general, in the name of the state, at the relation of Aaron Ogden, esquire, against Jabez Parkhurst.
*By this information the court are informed and [*435 given to understand, that the said defendant for the space *538 of four months and more before the filing of the said information, had usurped, intruded into, and unlawfully held and executed, the office of clerk of the Court of Common.Pleas, and Quarter Sessions of the Peace, of the county of Essex.
The defendant, in the same term of May, 1802, comes into court and sets forth in pleading, 1. The act of Dec. 1, 1801, whereby among other things it is enacted in substance, that when any person holding a commission under this state had been elected a member of the senate or house of representatives of the United States, since the act of the seventeenth of March, 1795, and had taken his seat therein accordingly, the commission under this state should be considered as vacated, unless 'he should resign such seat in congress, and give notice thereof to the governor within twenty days after the passing of the said act. 2. That after the passing of the said act of 17th March, 1795, and before the passing of the said act of Dec. 1, 1801, viz., on the 26th of February, 1801,- Aaron Ogden, esquire, then holding the said office of clerk, &c., by commission, under the authority of this state, was in due form elected a member of. the senate of the United States, and on the fourth of March in the same year took his seat accordingly; that the said Aaron Ogden did not within twenty days after the passing of the said. act, resign his seat in the senate of the United States and give notice thereof to the governor of this state, but continued to hold the same, by reason whereof the said commission of clerk, &c., became vacated. 3. That the said office being thus vacated, the defendant, Jabez Parkhurst, was appointed and commissioned to that office by the governor of the state, by commission bearing date Dec. 23, 1801; and that on the thirtieth of the same month, the said defendant accepted the said office, &o., was duly sworn in, &c., and that in virtue thereof he hath used, exercised and claimed the said office, and not otherwise; and thereupon prays judgment that the said office may be allowed to him, &c.
*539 The attorney general replies that the matters in the said plea pleaded are not sufficient to preclude the state from their information aforesaid, because he says—
1. That the said Aaron Ogden, on the 30th of October, 1800, was elected by the joint meeting, and on the same day was duly commissioned by the governor to be clerk, &c., for the term of five *years, and thereunto was duly [*436 qualified, &c.., and took upon himself the execution thereof in due form, and that lie was so in the due execution thereof at the time when the said Jabez did usurp, &c., the said term of five years not being then expired.
2. That the said Jabez, at the time when he was appointed and commissioned as aforesaid, was a member of the general assembly of this state, from the county of Essex, and prays judgment that the said Jabez may answer.
The defendant rejoins cum protestando, that the general assembly of which the said Jabez is supposed to be a member, before the date of his said commission, viz., on the third of December, adjourned without day, and have not ■since been convened or assembled; and as before prays judgment that his said commission be allowed, &c.
To this rejoinder the attorney general demurs; and the defendant joins in demurrer.
From this state of the pleadings it is manifest that the right of the demandant depends—
1. On the construction and operation of the act of December 1, 180 L
2. On the operation of the commission granted to the defendant by the governor of the state; and—
3. On the capacity of the defendant to take, in the situation in which he then stood.
For if the act of December 1, 1801, be inoperative, or in other words, if it be unconstitutional to declare that the commission should be considered as vacated in this case of Aaron Ogden; or, if the commission granted to the defendant by the governor, be inoperative or insufficient .to-carry *540 the office, for want of authority in the governor, or otherwise ; or, if the defendant, from his situation as a member of the general assembly, was at the time incapable of taking; in either of those cases, the defendant has shewn no right in himself to the office which he is said to have usurped, and the state of course will be entitled to judgment of ouster.
Beforé I say anything on these principal questions, I shall beg leave .to lay out of the way—
In the first place, all that has been thrown out at the bar in terrorem to operate on the fears of the court. I believe the time has not yet come in New Jersey, and I humbly trust in God it never will come, when 'a court, for investigating a *437] cause regularly brought *before them, and for the determining the right of the citizen therein, and pronouncing judgment according to the best of their abilities, will have anything to fear, either from legislative or executive interference on the one hand, or from the resentments or persecution of party on the other. The representatives of a free people, who value their own liberties and the liberties of their country, will not easily be brought to strike so fatal a blow at the regular administration of public justice, upon which those liberties so entirely depend. But even were it otherwise, we are bound by an oath to administer justice according to the- constitution and laws of the state; and in so doing I hope we shall at all times be able to adopt the maxims of our ancestors, and say, Fiat juetitia mat ccdum.
In the next place, I shall lay out of the way all that has been said as to the form of the information. . It is objected that it is informal and insufficient, because it does not state with certainty the time and place of the supposed intrusion, as to the place, containing Hunterdon in the margin, and Fssex in the body, and as to the time, leaving it to be collected by reference only to the time of filing the information itself. To these objections, if there be anything in them, the doctrine of amendments at common law, aided by the statute *541 of jeofails, which is expressly extended to imformations of this kind, I think afford a sufficient answer in this stage of the cause.
I shall lay out of the way, also, all that has been said as to the nature and extent of this remedy. It has been argued that it extends only to the offices and franchises of corporations within the state, and not to the offices of the state itself. The words of the statute are too broad to admit of this construction. “ In case any person or persons shall usurp, intrude into, or unlawfully hold or execute, any office or franchise within this state.” These words admit of no limitation. The mistake on this head has probably arisen from assimilating our statute to that of the ninth of Anne, to which in this particular it has no resemblance. That indeed had no relation to informations on a subject matter of this kind; it related only to corporations and their offices and franchises. But the old writ of quo warranto itself, which was a civil writ at the suit of the king, and not a criminal prosecution at all; and the information in nature of a quo warranto, which supplied its place after it had fallen into disuse, were much more extensive in their Operation. [*438 They are said by Blackstone to have for their object all offices, franchises and liberties. Viewing the information in this light, our statute goes neither to extend nor to limit its operation, but merely to render the proceedings upon it more speedy and effectual, not in certain specified cases, like the ninth of Anne, but in all cases where it is by the principles of the common law the proper remedy.
I proceed now to the principal questions in the cause. And, taking those of less importance first, I shall consider in the first place—
1. The capacity of the defendant to take.
The twentieth section of the constitution provides: 2hat none of the judges of the Supreme or other court, sheriff, or any other person possessed of any post of profit under the- *542 government, other than justice of the peace, shall be entitled to a seat in assembly; but that on his being elected and taking his seat, his office or post shall be considered as vacant.
. The arguments drawn from this section of the constitution against the defendant, premises, that having been elected a member of assembly from the county of Essex, and having actually taken his seat accordingly, he could not withdraw himself from that seat, or in any way divest himself of it, otherwise than by a resignation, during the sitting, and from thence concludes, that being in such situation, he could not accept, or take, or hold, the office in question, otherwise he would hold both the seat and the office at. the same time, which would be contrary to the constitution.
The force of this argument seems to me to depend upon the correctness of the first proposition, viz: That having once taken a seat he could not withdraw himself from that seat, or in any way divest himself of it, otherwise than by resignation, during the sitting.
If this be correct, it seems to me that the argument is conclusive. But where shall we find this doctrine established ? We find no clause in the constitution, we find no act of the legislature to this effect. It is nowhere said that a member of the assembly shall not accept of an-office of profit.
The fact is,' that soon after the establishment of our constitution, considerable doubt arose as to the true construction of this section of that instrument. Some, giving it a short construction, held that it operated only upon those who *439] held offices at the time *of their election, and at the time of their taking their seats, and not upon those who were elected to office after they had taken their seats ; that it prevented an officer from taking his seat and holding his office at the same time; but that it did not prevent a member from taking an office and holding his seat at the same time. And for this construction they relied principally upon the words of the last clause of the section, viz: That on his being elected and taking his seat, his office shall be consid *543 ered as vacant, relating as they insisted, altogether to such persons as were in office at the time of their election. But however correct this construction may be, according to the letter of the section, yet one much more liberal, and much better calculated to 'preserve the legislative department from all suspicio?i of corruption, ultimately prevailed; and it was determined, not only that a person actually holding an office of profit, being elected and taking his seat, vacated his office, but also that a person holding a seat, and afterwards being appointed to and accepting an office, should vacate his seat. And this being once settled, has been the uniform construction ever since.
The house of assembly, therefore, in these cases does not look for a resignation. It only wants to be informed that a member has been elected to and accepted an office of profit, in order to lay a ground for declaring the seat vacant, and ordering a new election. And in this form will be found, if I am not mistaken, the entries in the minutes in cases of this kind. Of this I think I could mention many instances. I can mention one with great certainty. It is my own case, when first appointed to a seat on this bench. In that case a resignation was actually called for by some of the younger members of the house, and the question brought forward in argument, but it was held and determined that no resignation was necessary, that the acceptance of the office vacated the seat; and in this instance too it was a mere parol acceptance, made to the speaker out of the house, and by him reported, and it was held sufficient to ground an order for a new election. This then I take to bo the legislative, and the only liberal and true construction of the section. A member of assembly is in no wray precluded from the acceptance of office at any time more than others, but his acceptance, if it be an office of profit, vacates his seat. We find, too, in the constitution of the United States a clause to this effect: Thai no person holding any office under the United States shall be a member of either house during his contin *544 *440] uance in office. And *on this clause it has been held in the case of Van Ness, from New York, that a member of the house may accept an office under the United States, but that such acceptance vacates his seat.
And this acceptance too was in the recess. Now, in principle I see no difference between these two. Indeed it is the only true and rational construction of both these instruments. As to this question, therefore, I think it is with the defendant. Secondly—
2. As to the authority of the governor.
In the twelfth section of the constitution, it is said, among other things, that clerks of the Inferior Courts of Common Pleas and General Quarter Sessions of the Peace in the several counties, shall be appointed by the council and assembly in joint meeting. In the case now before us the office in question became vacant, if at all, in the recess of the legislature, when no joint meeting existed, and in this situation of things the governor took it upon himself to appoint and commission. It is said he had no authority so to do.
As to precedent, but little can be collected from that source on this head. The practice has been both ways. .The courts, in the first year of our government, it is pretty manifest, in some cases exercised the authority now in question; but afterwards, in the time of Governor Paterson, the subject seems to have been more maturely considered, and the authority to have been claimed and exercised as a branch of the supreme executive, power; and from that time the practice instituted by him seems to have been uniformly followed. So far, therefore, as precedent goes at all, it is in favor of the execution.
But upon principle. The argument against the defendant, if I rightly understand it, goes upon these grounds, viz : first, that by the principles of the common law the courts of record had the right of appointing their own clerks; but, by the express words of- our constitution the common law is *545 declared to be our law; and that therefore thin right attaches to, or perhaps I should rather say remains in, our courts of record, except so far as it is expressly taken away, or otherwise disposed of by the constitution; and as the constitution has not placed it in any other hands during the recess of the legislature, when there can be no joint meeting, it must of necessity during that recess remain in the courts; and secondly, that if this conclusion cannot be supported, yet still, according to the groat rule of construction applied to all the American constitutions, and to our own among the rest, the several departments of ^government are to [*441 exercise certain defined powers, which can neither be amplified nor extended by implication or construction; that all that is not expressly given is retained by the sovereign people; that this power of appointment during the recess is not expressly given, and therefore that the assumption of it by the executive is an assumption of power with which neither the constitution nor the laws have vested him; and that therefore in this case the appointment- is void and the commission void.
By the section of the constitution above recited, the power of appointing clerks, &c., is expressly given to the joint meeting, not when the legislature is in session only, but without condition and without limitation. The whole power is placed there. Omitting, therefore, to enquire what right the courts of record had at the common law to appoint their own clerks, or how far that right has remained in, or lias been claimed or exercised by, the courts of record in New Jersey, it will be sufficient to say that it is now placed by the constitution in other hands; and being so placed it never can bo resumed. If the tribunal to which it is committed shall omit, or neglect, or refuse to exercise it, that cannot cast it back upon the court; the mere non user cannot revest them with a power once taken away.
*546 I would not be understood by this to say that a court cannot appoint a person merely to record their proceedings pro hae vice, in certain supposable cases; I believe this might well be done [ex necessitate rei; yet this appears to be a thing very different, and much more limited, than that now in question before us.
But if in this case the whole power is placed in the joint meeting, without condition and without limitation, and the courts cannot, even in the recess, claim to exercise it, upon what foundation, it may be asked, can the governor rest his claim.
By the eighth section of the constitution the governor is declared to have the supreme executive power, to be chancellor -of the state, and captain-general and commander-in-chief of all the militia and other military forces, &c. Now this supreme executive power, from the construction of the.sentence, must mean something distinct from-the chancellorship, and from the command of the militia. It must also mean something distinct from his function in the Court of Appeals and the Prerogative Court;.lor these being •merely judicial can in no sense be called the supreme executive power. What, then, does it mean? The very term, *442] supreme executive, in some *rneasure explains it. It certainly contains in it the powers necessary for the general administration of the government; it certainly contains in it the power of causing the laws to be executed when the ordinary provisions for that purpose fail. The propriety, the reasonableness and necessity of such a power being lodged somewhere, go far to justify this construction ; and under what more apt and appropriate terms could it have been conveyed, than the supreme executive power. If therefore, from the death, removal, or other disability, of any of -its officers, the public administration of justice should be impeded, and the right of the citizen be rendered insecure, I should certainly believe it not only the right but the indispensable duty of the governor, to supply such deficiency.
*547 As if tins principle would carry us too far, it lias been asked, can the governor appoint a chief justice ? Gan he fill up the bench of a county court ? As this power only devolves upon the governor ex necessitate, upon the failure of the joint meeting to appoint, or upon the death or removal of officers, or some other unforeseen casualty, perhaps he would hesitate in the cases stated, if there were judges enough left to proceed in the business of the courts ; yet even here I think his powers could not be questioned. But if the whole bench of the Supreme Court, or if any other court were to become vacant in the recess of the legislature, I have no hesitation in saying that it would be the duty of the executive at least so far to fill such bench as that the law should be executed, as that the justice of the state should not fail.
Both from precedent and principle therefore, I think we are authorized to say, that the governor as the supreme executive of the state, and he alone, hath authority to fill vacancies in the recess of the legislature.
I proceed now to the third, which I take to bo the great question in the case, viz.
3. The construction and operation, or in other words, the constitutionality, of the act of Dec. 1, 1801.
But at our entrance on this subject wo are arrested by the defendant, and told that we cannot proceed upon this investigation—
1. Because the constitution itself is in tho hands of the legislature, and may be altered at pleasure, and
2. Because the legislature are the ultimate judges of the constitution, and therefore this court has no power to control the operation *of a law upon the principle of its [*44S being contrary to that instrument.
As to tho first of these objections. Whatever might be said upon theoretical principles, considering that the constitution was framed by a convention never delegated for that purpose, and therefore never vested with competent authority *548 therefor; and considering also that it was not even by that convention intended or meant to be a perpetual law, but only to answer the pressing exigency of the times, as is manifest from its being made before the declaration of independence, as well as from many badges of colonial distinction which it still wears upon it; yet, notwithstanding these considerations, it has by general consent been received, and used ever since as the legitimate constitution of the state.
Without looking, therefore, into the spuriousness of its origin, we ipust receive and treat it as such, until the people shall think proper to lay it aside, and to establish a better in its place. Deceiving it then in this light as a constitution, if not framed, yet established by common consent, can the legislature change or alter it ?
What is a constitution? According to the common acceptation of the word in these United States, it may be said .to be an agreement of the people, in their individual capacities, reduced to writing, establishing and fixing certain principles for the government of themselves.
Among these principles, one of the most important in all our constitutions, is to prescribe and limit the objects of legislative power. The people are sovereign, they are supreme in power. The legislature act by delegated and circumscribed -authority; circumscribed as to its objects, circumscribed as to its. extent over those objects. Now to say that the legislature can alter or change such a constitution, that they can do away that very principle which at the same time gives and limits their power, is in my view, a perfect absurdity. It is making the creature greater than the creator. It is establishing despotism without limitation and without control. No — it is >a principle never yielded by the people, never claimed by the legislature, without reason, without foundation.
As to the second objection, viz: that the court has no power to control the operation of an act of the legislature, merely upon the principle of its being contrary to the constitution.
*549 *This is a question which of late years has been [*444 considerably agitated in these United States. It has enlisted many champions on both sides. It is a question equally arising out of every constitution where the legislative power is limited, and where there are certain rights or powers reserved in the hands of the people themselves, over which the legislature has no control. We may fairly avail ourselves, therefore, not only of the sentiments and decisions which have prevailed in our own state upon this subject, but also of those which have prevailed in our sister states, and in the United States.
At an early period of our government, while the minds of men were yet unbiased by party prejudices, this question was brought forward, in the case of Holmes and Walton, arising on what was then called the seizure laws. There it had been enacted that the trial should be by a jury of six men; and it was objected that this was not a constitutional jury; and so it was held; and the act upon solemn argument was adjudged to be unconstitutional, and in that case inoperative. And upon this decision the act, or at least that part of it which relates to the six men jury, was repealed, and a constitutional jury of twelve men substituted in its place. This, then, is not only a judicial decision, but a decision recognized and acquiesced in by the legislative body of the state.
In later days, in the case of Taylor v. Reading, a certain act of the legislature, passed March, 1795, upon the petition of the defendants, declaring that in certain cases payments made in continental money should be credited as specie, was by this court held to be an ex post facto law, and as such, unconstitutional, and in that case inoperative.
And with this decision before them, (for the act was made pending the suit,) and as I humbly conceive, fully acquiescing therein as to matter of principle, the legislature after-wards, in January, 1797, passed another act for the relief of the said defendant, Beading, in another way. These two *550 cases in New Jersey, determined upon full consideration, the former in the time of Chief Justice Be.eab.ley and the latter in the time of Chief Justice Kinsey, both afterwards brought into the notice, and acquiesced in, and, if I may so say, sanctioned by the legislature, would be sufficient to rule the question.' But the force of these cases is greatly increased by the uniform course of decision in other states, particularly Virginia and Pennsylvania, and above all, by reported deci*445] sions involving the same question in the Supreme Court of the United States of America.
I should be satisfied to rest here; but in addition, without touching the argument upon which these opinions have been founded, I will take the liberty to say, that the legislature of New Jersey themselves, have, by solemn act, impliedly decided the question.
To all judges, before they enter upon the execution of their offices, they have prescribed this oath, “I do solemnly promise and swear, that I will administer justice without respect to persons, and faithfully and impartially perform all the duties incumbent on me, according to the best of my abilities and understanding, 'agreeably to the constitution and laws of the state of New Jersey.” This I take to amount to a legislative determination, clearly declaring constitutional as well as legal rights and questions to be the proper subjects of judicial investigation and decision.
Laying out of the way then, as entirely without foundation, these two objections which have been raised at the threshold, let us proceed to look into the question itelf.
It appears from the statement of the case, that Aaron Ogden, the relator, on the thirtieth of October 1800, was appointed and commissioned, in due form of law, to the clerkship in question.
In the twelfth section of the constitution it is said, that clerks of the courts of Common Pleas and Quarter Sessions of the Peace shall continue in office for the term of five years; provided always, that they shall be liable to be dismissed *551 when adjudged guilty of a misdemeanor by the council, on an impeachment of the assembly. Now as Aaron Ogden, the relator, was regularly appointed and commissioned to this clerkship; and as it is expressly declared by the constitution that clerks si tall continue in office for the term of five years, subject to be dismissed only on impeachment, it is concluded that the act of December 1, 1801, so far as it comprehends or relates to this office, and declares that it shall bo considered as vacated, in another way, is contrary to the constitution and void. But this is not satisfactory to mo. Certain offices are in their own nature incompatible and inconsistent, and cannot be exercised by the same person at the same time. Certain other offices which might be fully executed by the same person at the same time, upon considerations of policy may be rendered incompatible by positive law. In this latter case, when the law is made to operate in futuro, and not to affect offices already ^vested, I [*446 believe no doubt has been entertained as to its constitutionality ; were it to have a retrospective view, and render incompatible offices already created, there would be more doubt; and perhaps the force of such a law might be questioned as an ex post facto law. But as to those cases of positive law, where there is no incompatibility in the offices themselves, I give no opinion; believing the case before us to be of the other kind.
As to the incompatibility, then, of these two offices.
It is said by Lord Coke, 4 Inst. 100, that offices are said to be incompatible or inconsistent, when from the nature or multiplicity of business in them they cannot be executed with care and ability by the same person at the same time.
. Now it is very obvious, and therefore will be readily conceded, that it is physically impossible for the same man, in his own proper person, to do the duties of the clerkship of Essex, and to sit in the senate of the United States, at Washington, at the same time. But it is said he may execute the clerkship by deputy.
*552 It is somewhat difficult to say what offices iti our government may, and what may not upon the principles of the common law, be executed by deputy. Ancient grants and local customs and usages, in England, have so far broken in upon the general principle, that it is not very easy, at this day, to distinguish what that general principle is. Nor can we draw much assistance in this matter from our own experience while in our colonial situation. For it cannot be dissembled, that in England, as well as in all other countries, I believe,' both ancient and modren, colonial offices have always been considered and distributed as the perquisites of the parasites and panders of the court, to be exercised as may best subserve their purposes. A practice too corrupt to give precedent to a free and virtuous republic.
Notwithstanding this obscurity, however, it is pretty clear, both from authorities and from the nature of the thing itself, that a judicial officer, generally speaking, cannot execute his office by deputy; nor can a ministerial officer, when the office, either by the terms of the grant, or by the law prescribing the duties thereof, are to be executed by him in person.
Since the act, therefore, of February 20. 1799, prescribing certain oaths, which says, that it shall be the duty of the clerk for the time being of the inferior Court of Common Pleas of each county in this state, and of hone other, to administer *447] the oaths of office and allegiance Ho judges, justices, <$fc., thereby making it necessary for him to execute this duty in-person; and since the act of June 13, 1799, to regulate ' fees, &c., whereby the clerk is authorized and directed to tax bills of cost, and in so doing to allow no charge, unless the service, in his opinion, shall have been necessary, &c., thereby creating him in this case a judicial officer. I say, since these acts, I should be inclined to think, that even upon common law principles, the clerkship of a county could not be executed by deputy, ■whatever might have been done before.
*553 But be this as it may, we have a more certain guide. We have the act of October 8,1778, which recites, That whereas no person who holds an office in this state, under an appointment of the joint meeting, is by the constitution authorized to let or farm out such office, or to depute any person to execute the same in his behalf or stead, &c., and therefore enacts that every person holding such office shall himself execute the same, except the surrogate-general, who may appoint deputies, &c.
This then being the condition upon which all offices, from that early period, have been granted, with what reason can it be said that the one now in controversy can be executed be deputy ?
Well, if the relator, holding a seat in the senate of the United States, can neither execute this office by himself nor by any other in his stead, it necessarily results, according to the doctrine of Lord Coke, that the two offices are incompatible and inconsistent. They cannot bo executed by the same person at the same time.
Now I hold it to be a clear principle, (and so it was determined by all the judges in the case of Sir Edward Coke, on his translation from the Common Pleas to the King’s Bench,) that if a person holding an office, be appointed to and accept another office, incompatible therewith, such acceptance of the second is a virtual surrender of and vacates the first. And so also it is said by Lord Mansfield, in Bur. 1615, in the case of The King v. Trelawney, Steward, &c., of West Coe.
And if this be so, the act in question, so far as it touches this office, is only declaratory of what the law was before. It neither alters the law nor changes the condition of the office. But inasmuch as one or more instances of this nature had before taken place, and the executive, (in which term I mean to comprehend the joint meeting,) either from some doubt as to the incompatibility, or from tenderness to the officers, or from some other 'cause, had declined *to resume the offices thus voluntarily surrendered, [*448 *554 and to fill up the same by new appointments, leaving them to be executed by the former incumbent in the best way he could, a¡? if there existed no such incompatibility, it became necessary, in order to secure the faithful execution of these trusts, for the legislature to interfere, and to pass a declaratory act, thereby giving to the executive a more clear and certain rule of conduct in all future cases of that kind.
And I cannot, in this place, help taking notice of the great forbearance of the act. Lest any person concerned might from inadvertence have been led into danger of losing an office which-he wished to hold, the act in question-gives him twenty days to reflect upon the subject, and (if he shall think it preferable) to resign the seat, and to resume and hold the'office.
This has been the course taken in the present case. To me it appears to be opposed by no principle of the constitution, by no principle of the laws, by no principle of reason or justice.
I shall only add, that in this case there is the less hardship on the relator, because when he accepted this office, it was, by the then existing law, declared to be incompatible with a seat in the senate of the United States, so that there could be no misapprehension on that subject; and though after his acceptance, this law, so far as relates to the office in question, was repealed, yet still he accepted it with this incompatibility before his face. He was then content with it thus qualified; and the act of December 1, 1801, puts him in no worse condition.
After investigating the cause, therefore, with some care, and giving it all the consideration I am able, I am of opinion, for the reasons above stated, that judgment must be for the defendant.

 Chief Justice Kirkpatrick, in a letter to the reporter dated January 28,1828, says “In the Court of Errors, as I was then informed, (at the time of rendition of the judgment in that court), the opinion of the court was taken upon each of the questions stated in this opinion, and an unanimous concurrence in each expressed/’