**UNITED STATES v. JEPSON et al.**

**Civ. A. No. 561–49.**

United States District Court
D. New Jersey.
April 18, 1950.

984

Sylvan D. Freeman, New York City, by Arthur Bennett, Brooklyn, N. Y., of counsel, for plaintiff.

Joseph G. Ochs, Newark, N. J., for defendants.

FAKE, Chief Judge.

The issues now before the court arise on a motion to strike the defendants demand for a jury trial.

The complaint contains two counts; the first count alleges that the defendants received for the use or occupancy of certain accommodations, rents in excess of the maximum legal rents established by authority of Sec. 2(b) of the Emergency Price Control Act of 1942, 56 Stat. 23 as found at page 25, 50 U.S.C.A.Appendix, § 902(b). This count alleges that defendants received from Mr. and Mrs. Fazio, as rent, $111 in excess of the maximum fixed by regulations and seeks treble damages, to wit, $333.

Defendants answering deny that they received rent in excess of that allowed by law. It is noted that this count in the complaint seeks nothing more than a money judgment. It is upon the issue thus joined that defendants seek a jury trial.

In this connection the Constitution of the United States provides as follows: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved * * *." Amendment 7.

This raises, at once, the question as to whether or not the cause of action here is one which was recognized as an action at common law prior to our severance from the mother country.

In the government's brief it is argued that "the present action is of statutory origin and is an emergency right created by Congress. Accordingly, defendants are not, as a matter of right, entitled to a jury trial." To sustain this argument counsel cite Woods v. Endekay Realty Corp.,[1] Civil Action No. 44-302 & No. 43-704, D.C.S.D. N.Y. Counsel also cites Creedon v. Arielly, D.C.W.D.N.Y., 8 F.R.D. 265. Another case cited by petitioner is U. S. v. Osipoff, Gibson, et al.,[1] No. 1106, D.C.S.D.Cal., apparently the granting of a motion, without opinion, striking defendants demand for a jury. For reasons hereinafter given I am not able to follow those cases.

Long prior to our independence there had grown up under original writs certain well-defined actions at common law, among them, the action of debt covering, among other causes, suits for statutory penalties and qui tam actions. See Chitty on Pleading, Vol. I, Seventh American Edition, page 126. That such an action was recognized as a suit at common law in this country, in the year 1795, is made sparklingly clear in U. S. v. Mundell, 27 Fed.Cas. 23, No. 15,-834. In that case the court had before it the problem as to just what was meant by "trials at common law" and it is there pointed out that "A distinction is sometimes taken between a suit at common law and a suit upon a statute, where the latter is grounded upon different principles from the former, in which case perhaps it may properly be said that the one is a trial at com-

1. No opinion for publication.

mon law, the other upon the statute * * * thus, in this case, though it be an action on the statute, it is an action of debt, which is a common law action, and will be tried in a common law manner, * * * Whatever, therefore, the laws order anyone to pay, that instantly becomes a debt which he hath before hand contracted to discharge, * * *."

A thorough treatise on the subject of the action of debt arising on statutory penalties is found in the opinion of Mr. Justice Harlan in the case of Hepner v. U. S., 213 U. S. 103, 29 S.Ct. 474, 53 L.Ed. 720, 27 L.R.A., N.S., 739. In that decision many cases are reviewed dealing with debt actions brought for statutory penalties. It is there stated, 213 U.S. at page 115, 29 S.Ct. at page 479, " * * * The defendant was, of course, entitled to have a jury summoned in this case * * *."

Further substantiating this position, the United States Supreme Court, speaking through Mr. Justice Murphy in Porter v. Warner Holding Co., 328 U.S. 395, at page 401, 66 S.Ct. 1086, 1090, 90 L.Ed. 1332, in a decision involving the nature of actions brought by the Price Administrator under the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., for rent overcharges stated: "It is true that § 205(e) authorizes an aggrieved purchaser or tenant to sue for damages on his own behalf; and if that person has not sued within the statutory period, or for any reason is not entitled to sue, the Administrator may institute an action for damages on behalf of the United States. To the extent that damages might properly be awarded by a court of equity in the exercise of its jurisdiction under § 205(a), see Veazie v. Williams, 8 How. 134, 160, 12 L.Ed. 1018, § 205(e) supersedes that possibility and provides an exclusive remedy relative to damages * * * Moreover, a court giving relief under § 205(e) acts as a court of law rather than as a court of equity * * *."

The study here should not be closed without reference to the early case of Holmes ads. Walton, cited in 9 N.J.L. 444, which was tried in New Jersey before a Justice of the Peace in the year 1778, and appealed from the Justice's court to the Supreme Court of the State where it was decided in the year 1780. The then Constitution of the State, which had been adopted in the year 1776, contained the following provisions: "That the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted, as are repugnant to the rights and privileges contained in this charter; and that the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, forever." Section 22.

In the year 1778 a State statute, Pamphlet, Laws of New Jersey 1778, page 104, was enacted to prevent intercourse with the then British enemy. The act made it "lawful * * * for any person or persons whomsoever to seize and secure * * * provisions, goods, wares or merchandise, attempted to be carried or conveyed into, or brought from within the lines or encampments, or any place in the possession of the subjects or troops of the King of Great-Britain." It further provided that the persons in whose possession such property might be found were to be taken before a Justice of the Peace. The law required the Justice, on demand of either party, to grant a jury trial according to the law of 1775 which provided for a jury of 6 men and further stipulated that in every cause where a jury of 6 men gave a verdict as aforesaid there should be no appeal allowed. The law of 1778 provided that if plaintiff should win the suit the goods were to be sold and the proceeds of the sale of the goods were to be divided among the persons seizing them.

While the foregoing law was in effect one Elisha Walton seized a quantity of goods in the possession of Holmes and Ketcham, whom he charged with having brought them from within the lines of the enemy. The goods were of considerable value, to wit, 29,428 pounds 13 shillings and 4 pence halfpenny. The cause was tried before a Justice of the Peace of Monmouth County on May 24, 1779 with a jury

of 6 men who brought in a verdict in favor of Walton.

Holmes and Ketcham appealed to the Supreme Court and that court issued a writ of certiorari to the Justice of the Peace. The Supreme Court consisted of Chief Justice David Brearley, with Isaac Smith and John Cleves Symes, associates. It is thought by historians and scholars that the opinion of the court was an oral opinion. A minute of it appears in the court record as follows: "This cause having been argued several terms past and the court having taken time to consider of the same * * * gave the seriatim for the plaintiffs in certiorari * * * and on motion of Boudinot, for plaintiff, judgment is ordered for the plaintiffs and that the judgment of the Justice in the court below be reversed and the said plaintiffs be restored to all things; * * *."

The late Dr. Austin Scott, some time President of Rutgers College, is the author of a priceless essay on the subject of that case. It there appears in the language of Dr. Scott that "persistent search failed to discover the opinion of Chief Justice Brearley. * * * It was probably an oral opinion and never written. Happily, however, there exists incontestable proof of its import. On the afternoon of the 8th of December, 1780, in the House of Assembly, a petition from sixty inhabitants of the County of Monmouth was presented and read, complaining that the Justices of the Supreme Court have set aside some of the laws as unconstitutional * * * to the encouragement of the disaffected and great loss to the loyal citizens of the State * * *."

It appears that the decision of the Supreme Court was based upon the contention that the legislation above mentioned was unconstitutional in that the jury thereunder "consisted of 6 men only contrary to law." Chief Justice Brearley held the legislative enactment unconstitutional because the Constitution provided that such trials should be by jury and at that time the word "jury" clearly connoted 12 men and not 6 men.

An analysis of the cause of action involved discloses that it was an action in debt as at common law, and so meticulously careful was Chief Justice Brearley in his allegiance to the Constitution that he fearlessly set the legislation at naught. The war of the Revolution was still raging in this State, and the result of that opinion was to return the goods to disloyal and subversive persons. Moreover, prior to becoming Chief Justice, Brearley had served as a Colonel in the Continental Army. One has but to read the history of that period in this State to realize the antagonism with which his very logical opinion was met. This was the first case known to our jurisprudence when an act of the legislature was declared unconstitutional by a court. I know of no case in the annals of jurisprudence which required greater judicial courage than that displayed by Chief Justice Brearley and his associates in that case.

In the year 1789 Chief Justice Brearley was elevated by President Washington to become the first Judge of the United States District Court, in which I, and my four colleagues, now sit. The case of Holmes ads. Walton is lost to all save professional historians and a few lawyers. It is of such importance to the federal bench and bar* that I take the liberty to annex a copy of Dr. Scott's essay as an appendix to this opinion. The case is pertinent here because of its bearing upon the common-law action of debt, and also because of the importance of jury trials now as in the past.

▮▮▮ It is my thought that when a federal statute embraces a common-law form of action, that action does not lose its identity merely because it finds itself enmeshed in a statute. The right of trial by jury in an action for debt still prevails whatever modern name may be applied to the action. To hold otherwise would be to open the way for Congress to nullify the Constitutional right of trial by jury by mere statutory enactments. It is by such methods that courts lose their power to enforce the Bill of Rights.

An order will be entered herein providing for a trial by jury on the issues joined on the first count of the complaint. The

trial of the equitable issues will be stayed abiding the event of the jury trial.

## APPENDIX *

### HOLMES vs. WALTON:
### THE NEW JERSEY PRECEDENT:[1]

A Chapter in the History of Judicial Power and Unconstitutional Legislation.

———

After the battle of Monmouth in June, 1778, the British commander made his way to Sandy Hook and thence to New York, where he established permanent headquarters, retaining, during the rest of the war, possession of Staten Island adjacent to New Jersey. On the 8th of October, 1778, the New Jersey legislature passed a law to prevent the increasing evil of intercourse with the enemy. This act made it "lawful for any person or persons whomsoever to seize and secure provisions, goods, wares and merchandise attempted to be carried or conveyed into or brought from within the lines or encampments or any place in the possession of the subjects or troops of the King of Great Britain." These goods and the persons in whose possession they might be found were to be taken before a justice of the peace of the county. The law required the justice, on the demand of either party, to grant a jury according to the law of February 11th, 1775, which provided for a jury of six men, and further stipulated, "that in every cause where a jury of six men give a verdict as aforesaid there shall be no appeal allowed." The law of October, 1778, further provided that if the plaintiff should win the suit the proceeds from the sale of the goods were to be divided among the persons seizing them.[2]

By virtue of this law, Elisha Walton, a major of militia, seized a quantity of goods in the possession of John Holmes and Solomon Ketcham, whom he charged with having brought them from within the lines of the enemy. The goods were of considerable value, there being between seven hundred and eight hundred yards of silk, between four hundred and five hundred yards of silk gauze, "mode," and many other articles, "such a quantity and such a quality as could not be purchased in all the

* By Austin Scott, 4 American Historical Review, 456.

1. The following pages include portions of a paper prepared about sixteen years ago and read successively before a private literary club, "The Fortnightly," of Newark, N. J., in 1883, before the Rutgers College chapter of the Phi Beta Kappa in 1884, and before the American Historical Association, April 28th, 1886. The paper was never printed in full though an abstract of it appears in the Papers of the Historical Association, Vol. II, No. I, page 45.

The original paper was a study of the growth of the power of the judiciary to pronounce upon the constitutionality of laws, but the propriety of publishing any other part of it than the one here presented has been entirely obviated by the careful treatment of the subject in late years by several authors, and especially in the exhaustive work of the late Brinton Coxe of Philadelphia, Judicial Power and Unconstitutional Legislation.

In that work, however, on page 222, the author, accepting the conjecture of Mr. William M. Meigs, is inclined to assign the New Jersey case of Holmes v. Walton to a date no earlier than 1786, whereas the constitutional question was raised before the court as early as November, 1779, and decided on the 7th of September, 1780, the case thus taking precedence in time of the other cases of like sort in which the principle was clearly acted upon.

Furthermore, Mr. Meigs, and Mr. Coxe following him, being without materials for an adequate knowledge of the case, pass it over with slight consideration of its possible influence in serving to widen the scope of judicial power in our federal system. This meagre treatment in a work speaking with all but final authority on its subject-matter, as well as numerous letters of inquiry concerning the case, which the present writer has received, lead him to give its history, in the hope that the following pages will call general attention to this early action of New Jersey and secure recognition of its value in determining forces which in the Constitution of the United States "establish justice."

2. Pamphlet Laws 1778. See also Wilson's Laws of New Jersey, Appendix V.

stores of New Jersey."[3] The case was tried before John Anderson, a justice of the peace of Monmouth county, on the 24th of May, 1779, with a jury of six men, who brought in a verdict in favor of Walton and judgment was given accordingly.[4]

While the suit was pending, the defendants had already applied to the Supreme Court then in session at Burlington, and the Chief Justice, Robert Morris, issued a writ of certiorari to Anderson, returnable at the next session of the Supreme Court to be held at Hillsborough in Somerset county, the first Tuesday of September. Meantime Morris resigned his seat on the bench and on the 10th day of June, David Brearley was appointed Chief Justice. The court opened at Hillsborough on the 7th of September, and on the 9th it was ordered that the case of Holmes v. Walton be argued on the ———— Thursday of the next term. Accordingly on Thursday, November 11th, 1779, the case was argued before the Supreme Court sitting at Trenton.[5] In offering his argument for the plaintiffs in certiorari, William Willcocks, their attorney, filed his reasons why the judgment of Justice Anderson should be reversed. The seventh reason reads as follows: "Because the jury sworn to try the above cause and on whose verdict judgment was entered, consisted of six men only, when by the Laws of the Land it should have consisted of twelve men." The same attorney, at the same trial, also filed separately "additional reasons," which read as follows:

"For that the said justice had not jurisdiction of the said cause or plaint but the same was *coram non judice.*

"For that the jury who tried the said plaint before the said justice consisted of six men only contrary to law.

"For that the jury who tried the said plaint before the said justice consisted of six men only contrary to the constitution of New Jersey.

"For that the proceedings and trial in the said plaint in the court below and the judgment thereon given were had and given contrary to the constitution, practices and laws of the land." [6]

At the close of the argument, the record shows that "on the reasons filed a *curia advisare vult* is entered." Under date of the following Monday, November 15th, the minutes state that "the court will further advise on the arguments had on this cause until the next term." In the succeeding term, April, 1780, the minute states, "The court not being ready to give judgment on the reasons filed and argued in this cause— Ordered, that a *curia advisare vult* until next term be entered; on motion of Mr. Elias Boudinot." In the minutes of the May term there is no record of the case. At the succeeding term, however, on Thursday, September 7th, 1780, ten months after the case had been argued, judgment was given.[7]

Before investigating the nature of the decision given and the probable cause of the delay in rendering it, it may be proper to inquire with what color of right the counsel could urge his plea against the constitutional validity of the statute of October 8th, 1778, which allowed a six-man jury. Section XXII, of the constitution of New Jersey, adopted July 2d, 1776, reads as follows: "That the common law of England, as well as so much of the statute law as have been heretofore practiced in this colony shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted as are

3. Papers on file in the office of the Supreme Court of New Jersey, Envelope 44928. In the later proceedings in the case, in April 1781, the amount of the claim of Walton on behalf of himself and the state was, in an order of the court, stated to be "twenty-nine thousand, four hundred and twenty-eight pounds, thirteen shillings and fourpence half penny" (original files Supreme Court). If we reckon the pound "proc-

lamation money" at about $2.43, the claim must have exceeded $70,000 probably in the depreciated currency of the day.

4. Minutes of Supreme Court, original in clerk's office in Trenton.

5. Minutes of Supreme Court, original in clerk's office in Trenton.

6. Files Supreme Court, Envelope 18354.

7. Minutes Supreme Court.

repugnant to the rights and privileges contained in this Charter; and that the inestimable right of trial by jury shall remain confirmed as a part of the law of this colony, without repeal forever" The final section of the same constitution prescribes as a part of the oath to be taken by each member of the legislature, that he will not assent to any law, vote, or proceeding to repeal or annul "that part of the twenty-second section respecting the trial by jury."

The assumption that the phrase "trial by jury" as thus used meant exactly twelve jurors must find its warrant farther back. In addition to immemorial custom, the "common law" of England, which may have been held to have had validity in this case, two documents may have been appealed to as fundamentally relevant and as constituting in New Jersey a part of the "law of the land:" the first, Chapter XXII, of the West Jersey "Concessions and Agreements" of 1676, "Not to be altered by the legislative authority," which begins thus, "That the trial of all causes, civil and criminal, shall be heard and decided by the verdict or judgment of twelve honest men of the neighborhood." The second was a formal declaration of the "Rights and Privileges" passed by the House of Representatives in East Jersey on March 13th, 1699, and accepted by the governor and council, which asserted that "all trials shall be by the verdict of twelve men." [8] Other acts of the assembly in each of the two Jersey provinces before their union in 1702, show that the right to a trial before a jury of twelve men was regarded as fundamental; notably the act of November, 1681, in West Jersey, and that of March, 1683, in East Jersey.[9]

The foregoing details have been recited as inferentially the basis of the argument of the attorney for the plaintiffs and of the decision of the court rendered on September 7th, 1780. On that day a full bench was present, David Brearley, the Chief Justice, with Isaac Smith and John Cleves Symmes, his associates.[10] The minute of the court reads thus: "John Holmes and Solomon Ketcham v. Elisha Walton, sur certiorari to John Anderson, Esq. * * * This cause having been argued several terms past and the court having taken time to consider the same, and being now ready to deliver their opinion, gave the same seriatim for the plaintiffs in certiorari. And on motion of Boudinot for the plaintiffs, judgment is ordered for the plaintiffs, and that the judgment of the justice in the court below be reversed and the said plaintiffs be restored to all things, etc." [11]

Persistent search has failed to discover the opinion of Chief Justice Brearly delivered in this case. It was probably an oral opinion and never written. Happily, however, there exists incontestable proof as to its import. On the afternoon of the 8th of December, 1780, in the House of Assembly, "a petition from sixty inhabitants of the county of Monmouth was presented and read, complaining that the justices of the Supreme Court have set aside some of the laws as unconstitutional, and made void the proceedings of the magistrates, though strictly agreeable to the said laws, to the encouragement of the disaffected and great loss to the loyal citizens of the state and praying redress." [12]

A second unquestionable proof that the decision of Brearly nullified the laws allowing a jury of six men appear in the subsequent proceedings of the Holmes-Walton case, which dragged along for years. In July, 1781, in the course of the new trial before the justice, ordered by the Supreme Court, Willcocks, counsel for Holmes, argues thus: "That the present cause being commenced and undetermined at the time of the late law authorizing a trial by twelve men [i. e., an act of December 22d, 1780, to be referred to later] it is not compre-

---

8. Leaming and Spicer, Grants and Concessions, pp. 372, 398.

9. Leaming and Spicer, Grants and Concessions, pp. 235, 428.

10. For sketches of these judges, see Elmer's Reminiscences, pp. 271 ff.

11. Minutes of Supreme Court, p. 343.

12. Votes and Proceedings of House of Assembly, p. 52; cf. Votes and Proceedings for 1780, pp. 36, 39, 54 et passim.

990

hended by the late law, it not having in it any retrospective clause; and as a trial by six men is unconstitutional, there is no law existing by which this cause could be tried." [13]

A message from Governor Livingston to the assembly on the 7th of June, 1782, is not without significance in the history of the recognition of this judicial function at this time and presumably in connection with this case. After stating that the chancellor (in that day, the governor) must seal a writ of replevin on the application of any citizen, Livingston continues, "But if an act of legislation can constitutionally be made, declaring that no person in whose possession any goods, wares or merchandise shall be seized and captured as effects illegally imported from the enemy, shall be entitled to such a writ * * * if such an act, I say, should be passed it would probably encourage such seizures and give additional check to that most pernicious and detestable trade, the total suppression of which is one of the most important objects that can engage the attention of the legislature." [14]

From the contemporary evidence cited above no doubt can remain that Brearly met the question of constitutionality squarely and on September 7th, 1780, announced the principle of judicial guardianship of the organic law against attempted or inadvertent encroachment by the ordinary law.

To form an adequate estimate of the historical value of this decision it is essential to ascertain how the principle thus enforced was received by the people of the state. The protest against the judgment by citizens of Monmouth county has already been cited. Other petitions poured in upon the assembly from the frontier counties of Monmouth, Middlesex and Essex, which Livingston in 1778 reported to Washington as "almost worn out in defending their own borders." One of these petitions read in the assembly on November 21st, 1780, prayed that the determination of causes arising under these laws, generally known as the "seizure laws," before a justice of the peace agreeably to the verdict of a jury may be final, and that such causes may not be removable to the Supreme Court by a certiorari.[15]

The evils of the illicit trade with the British during the last five years of the war can hardly be exaggerated. The practice was tantamount to treason, giving great aid and comfort to the enemy. Year by year and twice a year, laws, inspired by strong patriotic impulses and drawn with great care, were enacted only to be evaded, and the illicit trade went on. Small wonder then if the temptation came to the long-suffering patriots to disregard some of the ordinary safeguards of personal rights if thereby the men who were helping to prolong the war could be brought to justice! The plea of necessity must have weighed strongly with David Brearly, with Smith and Symmes, all of whom were staunch patriots, as each had proved by service in the field. The law of October 8th, 1778, had passed both houses without a dissenting vote, and if ever extraordinary war-powers might be construed into the constitution this was the occasion for their recognition. As we have seen, two terms of the court intervened before the decision in the case of Holmes v. Walton was rendered. From the judicial records the reason for the long delay is not apparent, but the proceedings in the legislature in the interval throw some light on the matter. On the very next day after the argument before the court, on Friday, November 12th, 1779, Deare, the Middlesex member of the legislative council, obtained leave to bring in a bill amending the "seizure acts." This bill in its final form passed the council on the 6th of December. We do not know what the provisions of the bill were, but we do know that the House of Assembly attempted to amend it by a clause confirming the requirement of the six-man jury in past and pending cases. This amendment the council refused to accept. Evidently then the council wished to

13. Supreme Court Files, Envelope 44928.

14. Votes and Proceedings, House of Assembly, June 7th, 1782.

15. Votes and Proceedings, p. 36.

come to the relief of the court and to the defence of constitutional rights. The house at first refused to appoint a committee of conference but yielded and made the appointment on the 23d of December. The committee of conference made its report which was adopted by the assembly on the 24th and by the council on the 25th.[16] The act which thus passed on Christmas day, 1779, provides in its preamble and first section as follows: "and whereas causes of considerable value may by virtue of this or the before-recited acts [acts of October 8th and December 22d, 1778] be prosecuted before a justice of the peace wherein it may be prudent to have the judgment of a greater number than six jurors; Be it enacted, * * *, that in all causes hereafter to be prosecuted before any justice of the peace, by virtue of this or the said recited acts, it shall and may be lawful for either of the parties in such suit to demand a jury of twelve men, which jury such justice is hereby empowered to grant and to issue a venire accordingly." [17] The act appears to have been in the nature of a compromise, for while its provisions do not maintain the validity of the six-man jury in past and pending cases, on the other hand, for the future, the justice of the lower court was not *required* but only *empowered* to grant a jury of twelve men.[18] The concession in the law by which an option was given to the magistrate to grant or deny a jury of twelve men rather than six, did not afford a perfect constitutional security. If then the court was awaiting action on the seizure laws by the legislature which, by devising a remedy for the alleged infraction of constitutional rights in the past and for their security in the future, might possibly forestall the necessity of a decision annulling the law of 1778, the delay was in vain. But the court probably reserved its decision through several sessions from a genuine wish to consider the case in all its bearings—"curia advisare vult." This more particularly appears in a letter from the justices of the Supreme Court to the legislature, dated May 13th, and from a law passed on June 17th, 1780, in consequence of the letter and following its suggestions. This law reads as follows:

"Whereas causes to a very considerable value are now frequently brought to trial before, and determined by, a single justice of the peace in a summary manner by virtue of the act entitled 'An act to prevent the subjects, etc.,' and the supplementary acts thereto; and whereas some of the justices before whom such trials are had commit errors in the determination of them in matters of form, whereby the judgment is reversed on certiorari and the cause lost without any default of the party although the merits are in his favor, for remedy whereof

"Be it Enacted, etc., That in all such causes where the judgment of the justice shall be reversed in the supreme court on certiorari for informality of proceedings, or *any other cause* not essential to the merits of the suits, such judgment of reversal shall only affect the parties with respect to the costs of the suit; and it shall and may be lawful for the supreme court on such reversal to award a new trial on the merits in the court below where the cause was originally determined; any law, usage or custom to the contrary notwithstanding." [19]

This letter and the law adopting its recommendations lead to the conclusion that the court was working its way to the just and discriminating use of the highest judicial function, to the principle, namely, that

16. Minutes of Assembly, pp. 47, 62, 86, 87, 92, 93, 96, 98, 101. Journal of Council, passim.

17. Original Laws of New Jersey, p. 49. Wilson's Laws, Appendix.

18. That this distinction in such use of these terms then obtained seems clear from the preamble and from the fact that "required" is used in the law of 1778 and in the law passed after the decision of the court in 1780.

19. For the letter of the justices of the Supreme Court to the speaker, see Votes and Proceedings, General Assembly, Saturday, May 13th, 1780. For the Act of June 17th, 1780, see Session Laws, p. 121, Chapter LIII.

a law is no law only so far as it is in exact conflict with the constitution; that all its other provisions if possible must stand. Thus a valuable service was rendered; the scope of the application of this judicial power was thereby in anticipation defined. When they were ready Brearly and his associates did not flinch. Being practically without precedent to guide them, at the very beginning of the next session of the court, the judges severally gave their opinion and from the 7th of September, 1780, this function of the judiciary, this principle of judicial power over unconstitutional legislation, has held sway in New Jersey. The brave and honorable act met with protests, as we have seen, but the body of the people acquiesced, and a legislature, chosen by the people the next month, with the protests before it, ratified the action of the judiciary after prolonged consideration, by passing a law, which in its 13th section *requires* the justice on the demand of either party in such suits to grant a jury of twelve men, and ordered the act to be printed in the *Gazette* newspaper and extra copies to be printed.[20]

The full significance within New Jersey of the decree of the court and the action of the legislature is acknowledged in the following words of Chief Justice Kirkpatrick in 1804, in his opinion in the case of State v. Parkhurst, 9 N.J.L. 427: "This question" (viz., whether the court has power to control the operation of an act of the legislature upon the principle of its being contrary to the constitution) "was brought forward in the case of Holmes v. Walton, arising on what was then called the seizure laws. There it had been enacted that the trial should be by a jury of six men; and it was objected that this was not a constitutional jury; and so it was held; and the act upon solemn argument was adjudged to be unconstitutional and in that case inoperative. And upon this decision the act, or at least that part of it which relates to the six-man jury, was repealed and a constitutional jury of twelve men substituted in its place. This then is not only a judicial decision but a decision recognized and acquiesced in by the legislative body of the State." [21]

Was the case of Holmes v. Walton of value beyond the borders of New Jersey? It made a deep impression in one important quarter at least. In 1785, Gouverneur Morris sent to the Pennsylvania legislature an address, whose object was to dissuade that body from passing a law to repeal the charter of the National Bank. In the course of that address he says: "A law was once passed in New Jersey, which the judges pronounced unconstitutional, and therefore void. Surely no good citizen can wish to see this point decided in the tribunals of Pennsylvania. Such power in judges is dangerous; but unless it somewhere exists, the time employed in framing a bill of rights and form of government was merely thrown away." [22]

The late Brinton Coxe, in his recently published work on *Judicial Power and Unconstitutional Legislation,* has argued with exhaustive force that the framers of the Constitution intended by the language used in Art. VI, Clause 2, and Art. III, Section 2, an *express* grant to the judiciary to pronounce void unconstitutional legislation. Whether we hold as Hamilton does in the *Federalist* that this judicial power is not expressly but beyond question impliedly granted, and as Marshall does in Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60, when he derives it solely by inference and implication, or with Coxe that it is *expressly* granted though not *defined,* it is certain that the framers of the Constitution intended to lodge this power in that instrument, and this intention, the records clearly show, became fixed only during the progress of the Federal Convention. The cases of the application of this principle in the states, previous to 1787, had not led to the proposal of its embodiment in the "Vir-

20. Act of December 22d, 1780. For the series of acts on this subject, see the Appendix of Wilson's Laws of New Jersey.

21. 4 Halsted 444, 9 N.J.Law 444.

22. Spark's Life of Gouverneur Morris, III. 438.

ginia plan" of reforming the Union. Madison, that careful student of government, had chosen not to provide in that plan "this security for the justice of a state against its power." Hamilton in the debates in the Convention and in his "plan" does not contend for it. It is not brought forward by that learned civilian, Wilson. The principle of judicial invalidation of laws on the ground of unconstitutionality was no novelty to these men,[23] and the specific application of the principle had been brought to the attention of the whole Convention in one of its earliest sittings on the 4th of June, when Gerry made the oft-quoted remark, "In some of the states the judges had actually set aside laws as being against the constitution. This was done too with general approbation." To no one of all the cases "in some of the states" which are known to us can the remark of Gerry apply with so much pertinency as to the New Jersey case of Holmes v. Walton. In Rhode Island certainly "general approbation" did not follow the action of the judges in the case of Trevett v. Weeden. A knowledge of the North Carolina case, Bayard v. Singleton, 1 N.C. 5, had not yet arrived. The New Jersey case had been received, as we have seen, "with general approbation" by the people of the state as shown in the acquiescence of the legislature and the approbation of the governor. The very fact that this principle was not novel made its rejection by the prime movers of reform the more significant when finally accepted by them. The stone which the builders refused was to become the chief corner-stone in the edifice. All honor to those at whose instance it was proposed for the very foundation of the political structure! But we do not perfectly know through whose influence and action this was done. It is a question of probability.

The guiding spirits of the Convention were evidently reluctant to sanction the full application of this judicial function, at least in its use of testing state laws by the Constitution of the United States. The "Virginia plan," as all know, proposed to vest in the national legislature a legislative veto on state laws, and this was accepted by the Convention in committee of the whole. When, however, the vexing question of equal or proportionate representation as between the large and small states was adjusted, a resolution was adopted *nem. con.* on July 17th, which made the constitutional acts and treaties of the United States the supreme law of the sev eral states and bound the state judges so to hold notwithstanding state laws to the contrary. The words of this resolution are in all but the smallest particulars identical with a paragraph of the plan submitted by William Paterson on the 15th of June, the plan known then and ever since as the "New Jersey plan." This readiness of the members of the Convention to accept the resolution may, as Coxe properly enough infers, though without any definite evidence, have been stimulated b. the news of the decision in North Carolina of the Bayard v. Singleton case, the opinion of the court having been rendered in the latter part of May after the assemblin₅ of the Convention. It is to be noted, however, that just previous to the vote of the 17th of July accepting the resolution taken from the "Jersey plan," the delegation from North Carolina was the only one in the Convention to join the States of Virginia and Massachusetts in adhering to the scheme of the general negative on state laws.[24]

23. As evincing a general recognition of this principle in colonial days (1759), see Colden's Letter on Smith's History of New York, New York Historical Society Collections for 1869, page 204.

24. Elliot, V 322. An interesting phase of the gradual acceptance of the principle in the Convention appears in the attempt of Randolph, the sponsor for the Virginia Plan, to mediate, on July 10th, between the large and small states. On that day he proposed for the states a power of appeal to the national judiciary against alleged unconstitutional use of the national legislative veto of state laws, and for individuals an appeal against the operation of a state law to the same tribunal, which "may adjudge such law to be void if found contrary to the principles of equity and justice" Elliot, V. 580.

The words of the resolution as submitted by Paterson on the 15th of June are as follows: "Resolved, That all acts of the United States in Congress made by virtue and in pursuance of the powers hereby and by the articles of the confederation vested in them, and all treaties made and ratified under the authority of the United States shall be the supreme law of the respective states, so far forth as those acts or treaties shall relate to said states, or their citizens; and that the judiciary of the several states shall be bound thereby in their decisions, anything in the respective laws of the individual states to the contrary notwithstanding." The origin of this paragraph is referred by Coxe to the letter and resolution of Congress which had been sent as a circular to the several states in the preceding April. This letter requested each state to pass an act, the form of which was inclosed, which would repeal all laws repugnant to the treaty of peace and should direct the state courts to hold that treaty as part of the law of the land, anything in the laws of the state to the contrary notwithstanding.

There were in the Convention several men who were sitting in the Congress when this circular letter and the form of repeal were adopted. Madison helped to frame it; Gorham and King of Massachusetts were also there; but from no one of these men came the suggestion of the resolution of the "New Jersey plan" which was proposed on the 15th of June and adopted by the Convention without a dissenting voice upon the 17th of July. The probability that the paragraph in the "New Jersey plan" was suggested by the proposal of Congress of March and April does not detract from the value of the services of those who incorporated it into the "New Jersey plan." The Congressmen in the Convention had not given it the "cold respect of a passing glance." The honor of a formal recognition and proposal of the principle of judicial nullification of unconstitutional law in our federal system must be ascribed to the authors of the "Jersey plan."

Coxe in the concluding portion of his work on *Judical Power* maintains that the recognition of this principle as finally expressed in the sixth section of the second article of the completed Constitution cleared the way for and influenced the adoption in the Convention of the power in its full application by federal as well as by state courts. The sixth section of the second article is essentially the first part of the sixth resolution of the "New Jersey plan," modified in form of expression but unaltered in principle and unchanged in its purpose to give a judicial determination in case of conflict of the inferior with the superior law. This becomes more clearly apparent if the clauses in the "New Jersey plan" be examined which contemplated only one United States court, to which an appeal was authorized from the state courts, which by that plan, therefore, were made a portion of the federal system. The fact that the "New Jersey plan" proposed only an enlargement of the powers of general government rather than a radical change does not affect the validity of the reasoning which proves that that plan, by its recognition of an adequate scope for the exercise of this judicial function, essayed to provide a sure means of defence for the Union, a guaranty for its permanence.

The "Virginia plan" was accepted by the Convention as a basis for its work, while the "New Jersey plan," as a whole, was rejected, but the chief propositions of the former were one by one cast aside. Such were the proportional representation in both houses of Congress, the right of that body to negative state laws and the manner of choosing the executive. On the other hand some of the proposals of the "New Jersey plan" were embodied in the Constitution as finally adopted. Evidence is not wanting that the authors of the "New Jersey plan" intended that their work, while it embodied some fundamental principles, should serve in part, and for the time being, merely as a breakwater to give a new direction to the tide in the Convention which was hurrying to an extreme of nationalism and which threatened to sweep

away some of the surest safeguards of a real and no less complete nationality. The express recognition of the judicial right to say to the inconsiderate or passionate use of the popular power "thus far and no farther," was a distinct contribution to the science and art of government and a boon to mankind. The representatives of other "small" states shared with the New Jersey delegates in the making of the plan which, however, no doubt with perfect propriety, bears the name of that state.[25] It seems highly probable that those delegates who had already adopted the principle of judicial supremacy in their own state should propose it for the Union, though it must be admitted that this assumption is warranted only by conjecture.

David Brearly, who was at this time still Chief Justice of New Jersey, was the one man in the Convention who as a judge had pronounced a law unconstitutional. William Paterson had been the secretary of the convention which framed the New Jersey constitution in 1776, and had been at the time of the suit of Holmes against Walton the Attorney-General of the state. William Livingston, as Governor, an office he still retained, had shared in the legislative acquiescence in the decision of the court, and had, as we have seen, carefully considered the matter in suggesting reforms of the law which had been called in question by the court. Of all in the Convention, it is safe to say that no man had been better trained than these three by the practical experience of a long labor over the question of the exercise of this highest judicial function. It was natural that these men should have urged its incorporation into the plan bearing the name of their state, which proposed a reform of "the federal constitution."[26]

Brearly was appointed by Washington, in the earliest months of his administration, in 1789, the first judge of the federal district court of New Jersey, but died next year at the early age of forty-five, too soon to have his due share in the larger national life. Livingston, having been annually chosen Governor from 1776 to 1790, died in the latter year at an advanced age, and was succeeded by Paterson, who resigned the office of United States senator to accept that of governor of New Jersey. While in the senate Paterson, as second to Ellsworth on the committee for organizing the judiciary, did his share in framing and supporting that memorable act establishing the federal judicial system. In 1793 Paterson was appointed by Washington a justice of the Supreme Court of the United States. He died in 1806, having been on the bench as associate respectively of Jay, Ellsworth and Marshall.

The following summary expresses in brief the reasons for the view of the present writer that the case of Holmes v. Walton is of considerable importance in our constitutional history:

1. It seems to take precedence in point of time of all similar decisions. The question of constitutionality was raised before the Supreme Court of New Jersey on the 11th of November, 1779, and decided on the 7th of September, 1780.

2. The question of constitutionality was brought squarely before the court and was squarely decided. Other questions and other principles were apparently not involved in the decision.

3. The judgment was not given *ad cap tandum*. It was clearly announced after long and careful consideration, and evidently with a complete and intelligent view of its immediate, and in some degree of its far-reaching importance in the state at least. The evidence warrants the conclusion that the New Jersey judges desired to fix the scope of this power. They would

---

25. "Mr. Paterson observed to the Convention that it was the wish of several deputations, *particularly that of New Jersey*, to digest a plan purely federal." Elliot's Debates, V. 191.

26. The other deputies from New Jersey, William Churchill Houston and Jonathan Dayton, did not share at this time in the labors of the Convention. The former had gone home suffering from an illness which proved to be mortal, and the latter had not yet arrived.

leave intact all those portions of the law which were not plainly void.

4. The decision does not recognize "necessity" or extra-constitutional legislative war-powers or the special plea of patriotic motives in construing the organic law.

5. It is a happy circumstance that the decision guards one of the oldest and most important of constitutional rights, that of trial by a real jury.

6. The decision, though meeting with some opposition, was ratified by a legislature fresh from the people.

7. It had its influence outside of New Jersey, being cited in the appeal by Gouverneur Morris to the Pennsylvania legislature five years after it was rendered. This appeal was published in Philadelphia, then the central city of the Union, where Congress had had its sessions and where the Federal Convention two years later was to assemble.[27]

8. It must have had a value in preparing for the special duty of formally proposing the principle, Brearly, the Chief Justice, who rendered the decision; Paterson, the Attorney-General, and Livingston, the Governor, the three Jerseymen who in the Federal Convention gave form and name and support to the "Jersey plan."

9. To the "New Jersey plan" is due the formal proposal and therefore, in large part, in due time and by due process, the final acceptance of this principle of judicial control in our legal system.

---

27. The decisions in the case of Trevett v. Weeden, in Rhode Island, 1786, and of Bayard v. Singleton, in North Carolina, 1787, both involving more or less the constitutional right of a trial by jury, may have found some support in the New Jersey case of Holmes v. Walton, of 1780. A desire to compliment the authors of those decisions by imputing to them the possession of information sufficient to include a knowledge of this case in a sister state would perhaps warrant such an assumption. Lack of historical proof alone prevents the present writer from showing this courtesy to their memory.

It may be proper, however, to add, by way of further conjecture, that Gen. James M. Varnum, who was the learned counsel in the case of Trevett v. Weeden, and who afterwards published a pamphlet giving the history of the case, was a member of the Congress of 1780 and attended the sessions then held in Philadelphia. The case of Holmes v. Walton, which had just been decided, and which was stirring the interest of the people of New Jersey, could scarcely have failed to attract the attention of Varnum. Furthermore, a colleague of Varnum in the Congress of 1780 was William Churchill Houston, a delegate from New Jersey and in 1781 the clerk of its Supreme Court; but, so far as the present writer is concerned, anything beyond this circumstance is pure conjecture.