Bernard DAMSKY, Olga Damsky and Henry Birns, Petitioners,

v.

Honorable Joseph C. ZAVATT, United States District Judge for the Eastern District of New York, Respondent.

No. 26641.

United States Court of Appeals Second Circuit.

Argued Jan. 9, 1961.

Decided April 3, 1961.

Before   CLARK,   MOORE   and FRIENDLY,   Circuit   Judges.

FRIENDLY, Circuit Judge.

Bernard Damsky, his wife, Ollie Damsky, and Henry Birns, defendants along with Robert W. Franz in an action relating to federal income taxes brought by the United States in the District Court for the Eastern District of New York, seek a writ of mandamus directing Judge Zavatt to vacate an order, 1960, 187 F. Supp. 404, striking their demand for a jury trial.  The government does not dispute that mandamus should issue if petitioners are in fact entitled to such a trial, Beacon Theatres, Inc. v. Westover, 1959, 359 U.S. 500, 511, 79 S.Ct. 948, 3 L.Ed.2d 988; Goldblatt v. Inch, 2 Cir., 1953, 203 F.2d 79; Parissi v. Foley, 2 Cir., 1953, 203 F.2d 454; this, however, it contests.  We have concluded that the writ must issue as to so much of the complaint as seeks a personal judgment against Bernard Damsky on the taxes for 1946, 1947 and 1955, which were assessed solely against him, but that otherwise the jury demand was properly struck.

The complaint of the United States asserts "This is a civil action to enforce federal tax liens on real property, and to obtain judgment for unpaid federal taxes," of which the District Court had jurisdiction under 28 U.S.C. § 1340.  It alleges the making of assessments and the filing of notice of tax liens for 1946, 1947 and 1955 against Bernard, for 1945 and 1946 against Ollie, and for 1948, 1949, 1952 and 1953 against Bernard and Ollie jointly.  The complaint further alleges that as of the dates on which the various assessments were made and the notices of liens filed, Ollie owned two parcels of real estate in Brooklyn and that on or about April 29, 1955 (a date prior to the filing of any notices of liens on the assessments made solely against Ollie and all but one of the notices of liens against Bernard and Ollie jointly), Ollie conveyed one parcel to defendant Birns and the other to defendant Franz with intent to hinder, delay or defraud creditors or, in

Linker & Linker, Brooklyn, N. Y., for petitioners.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., for the United States.

the alternative, without a fair consideration, Ollie then being or being rendered insolvent. The complaint concludes with an allegation that "On information and belief, each of the defendants may claim to have some interest in the real properties referred to in paragraph 16 hereinabove, on which the plaintiff seeks to enforce its tax liens." The United States prayed that the court adjudge Bernard and Ollie liable for the various taxes, penalties and interest assessed, plus interest; determine that the United States has valid tax liens on the real properties prior to any liens, claims and interests of the defendants or, in the alternative, determine that the real properties were transferred in fraud of creditors and set such transfers aside; and decree a sale of the real properties and distribution of the proceeds to the United States in satisfaction of its tax liens.

Petitioners answered and made a timely demand for a jury trial. This the government moved to strike. Judge Zavatt granted the government's motion; the petition for mandamus followed.

■■ The parameters of decision are readily stated. F.R.Civ.Proc. 38(a), 28 U.S.C., prescribes that "the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate." The pertinent statutes of the United States, 28 U.S.C. § 1340; I.R.C. (1954) §§ 6502, 7401, 7402 and 7403, 26 U.S.C. §§ 6502, 7401–7403, make no specific provision for or against jury trial. The Seventh Amendment directs that "in Suits at common law, where the value in controversy shall exceed $20, the right of trial by jury shall be preserved * * *." The common law referred to is the common law of England as of 1791, Baltimore & Carolina Line, Inc. v. Redman, 1935, 295 U.S. 654, 657, 55 S.Ct. 890, 79 L.Ed. 1636. If a jury demand includes issues as to which a party is not entitled to a jury trial, the court ought not to strike the demand altogether but should limit it to the issues on which a jury trial

was properly sought, F.R.Civ.Proc. 39(a)(2).

Plain as these principles are, their application here presents some difficulties. The considerations pertinent to various claims in the complaint differ; hence it will be necessary to examine these separately. It will be convenient to take first, Section I, the claims as to which we think jury trial was required; next discuss, Sections II and III, those as to which it clearly was not; and end, Sections IV and V, with the claims we deem most debatable. If some of the discussion that follows may seem to reek unduly of the study, a sufficient answer is that the Seventh Amendment, like other provisions of the Bill of Rights, "is derived from history," Mr. Justice Frankfurter dissenting in Green v. United States, 1957, 355 U.S. 184, 199, 78 S.Ct. 221, 230, 2 L.Ed.2d 199, and we must turn to history to give it content and meaning.

I. *The claims asserted solely against Bernard.*

■ As to so much of the complaint as sought a judgment against Bernard for taxes, penalties and interest for which he was solely liable, the action was for a money judgment and nothing more. Although the complaint contained a general prayer that the court determine "that the United States has valid and subsisting tax liens on the real properties" formerly owned by Ollie, the tax liens filed against Bernard individually were not liens against Ollie's property, I.R.C. § 6321, 26 U.S.C. § 6321, and the vague allegation that Bernard might claim to have some interest in the properties was not enough to make the action one to establish and foreclose a lien on any property of Bernard's,—at least in a state such as New York where, since 1930, spouses do not have even an inchoate interest in each other's property but only certain rights to share in such property as the spouse may own at death, Decedent Estate Law, McKinney's Consol.Laws, c. 13, §§ 18, 82, 83; Newman v. Dore, 1937, 275 N.Y. 371, 9 N.E.2d 966,

112 A.L.R. 643. Hence I.R.C. § 7403, which we quote below, footnote 4, does not apply.

Study of the history of the Court of Exchequer shows that, under the common law of England in 1791, an action by the Crown to recover a judgment for taxes was a suit at common law in which the right of jury trial existed. This was the result of a long evolution.

The Exchequer of the twelfth century was "a compound institution, in part a judicial tribunal, in part a financial bureau." 1 Pollock & Maitland, The History of English Law (2d ed. 1889), 191–93. It was "a specialized body devoted to the purposes of Audit"; its function was the collection and management of the King's revenue. Selden Society Series, Vol. 48, Select Cases in the Exchequer of Pleas (1931), pp. xiv, xxviii (Jenkinson's introduction). In the course of collection legal disputes inevitably arose and were adjudicated, Select Cases, supra, at p. xxviii; 1 Holdsworth, A History of English Law (3d ed. 1922) 43, 44, "according to the customs and usages of the exchequer"; its functioning has been likened to that of "an administrative tribunal," 1 Pollock & Maitland, supra, at 192.

By the end of the thirteenth century "the judicial side of the department was beginning to be more definitely separated from the administrative side," Holdsworth, supra, at 232; the Exchequer had become not merely an executive department but a revenue court trying cases brought by the King to collect his debts, Plucknett, A Concise History of the Common Law (5th ed. 1956) 159–60. As a revenue court it "decided questions between the crown and the taxpayer, and between the crown and accountants to the crown," Holdsworth, at p. 238; however, in this period, cases of the latter sort must have predominated since the taxes were collected mainly by distraint—a procedure the prevalence of which is attested by c. 9 of Magna Carta—and taxpayers "were practically never ordered to appear and account to the exchequer or the special exchequer," Mitchell, Taxation in Mediaeval England (1951), pp. 101, 110.[1]

By the time of Lord Coke the Exchequer was established as a third court of common law, Plucknett, supra, at 171. It was divided into distinct departments concerned with "judicial accounts" and with "the receipt of the exchequer." IV Institutes 103. Coke described the Exchequer as a court "for the profit of the king," id. at 112. Its business in part was to adjudicate with respect to "lands, rents, franchises, hereditaments, debts, duties, accounts, goods, chattels, and other profits, and benefits whatsoever due to the king." Ibid. Blackstone's description of the Exchequer in the following century is similar, 3 Commentaries, 43–45; in addition to its administrative functions, the King sued there "to adjust and recover his revenue * * * as the withholding and non-payment thereof is an injury to his *jura fiscalia*."

In a number of cases the Court of Exchequer entertained informations of debt for nonpayment of customs and other duties. Attorney General v. Tooke, Hardres

---

1. Some historians think the significance of the judicial side of the Exchequer in this early period has been exaggerated. See Tout, The Place of Edward II in English History (1914), p. 55, citing G. J. Turner, Introduction to Year Books of 3 and 4 Edward II, xxi–xxii.

On the other hand, it is plain that by the end of the thirteenth century the Exchequer was reaching into non-revenue areas; the curbs sought to be placed upon it by late thirteenth century ordinances and statutes forbidding it to hear common pleas, 1 Holdsworth, p. 235, notably the Articuli super Cartas of 1300, 28 Edward I, c. 4, cf. Coke, IV Institutes 114, were only partially effective. Later it escaped the restrictions altogether by the writ *quo minus sufficiens existit*, which enabled any subject to invoke its jurisdiction by an incontrovertible allegation that by reason of the defendant's failure to pay sums owing him, the plaintiff was less able to pay his debts to the King. Select Cases, supra, at pp. xiv, xc; Holdsworth, supra, at 239–40; 3 Blackstone, Commentaries, 44–46.

334, 145 E.R. 484 (15 Charles II); Attorney General v. Weeks, Bun. 223, 145 E.R. 654 (1726); Attorney General v. Jewers & Batty, Bun. 225, 145 E.R. 655 (1726); Attorney General v. Hatton, Bun. 262, 145 E.R. 668 (1728); Attorney General v. ———, 2 Anst. 558, 145 E.R. 966 (35 Geo. III). Nor were such actions unknown to the King's Bench, Salter v. Garraway & Malapert, 1 Rolle 383, 81 E.R. 551 (1675): "Dett sur statute 1 Ja. pur nient paieing de customes." Commentators also recognized that an action of debt might be maintained to recover duties. 3 Comyns, A Digest of the Laws of England (1825 ed.) 366, citing additional cases; Hale, A Treatise in Three Parts, in 1 Hargrave, Collection of Tracts Relative to the Law of England (1787), 217. At the same time many taxes continued to be collected by non-judicial means. See G. Jacob, The Laws of Taxation (1720), citing various statutes of Charles II, William and Mary, William III, and George I, pp. 2, 4, 11, 27–30.

Whether there was a right to jury trial in the informations of debt in the Exchequer seems not to have been explicitly discussed, probably because no one had any doubt about it. For the practice in the Exchequer was essentially that of the common law. Plucknett, supra, at 160, cites a Parliament roll of 1376 authorizing wager of law in the Exchequer, in cases where the King was not a party, on the modern-sounding ground "that jury trial was to the great damage of the people and the impoverishment of the jurors and caused much delay," Rot. Part ii, 337 no. 92. That a jury was used in such actions at the time most directly relevant to our problem is shown by the case from 35 Geo. III, supra, the report of which recites "A verdict having been given for the crown." Moreover, there was a clear distinction between the "English information," which was in the nature of a bill in equity, and the "information of debt," which was an action at law. See United States v. Lyman, C.C.D.Mass. 1818, 26 Fed.Cas. page 1024, No. 15,647

(Story, J.), which recognized the King's power to sue in debt for his taxes. The action of debt was one of the common-law forms of action; and in common-law actions there was a right to trial by jury.

In the colonies and the young states, "the process of distress [was] in nearly or quite universal use for the collection of taxes," Murray's Lessee v. Hoboken Land and Improvement Co., 1855, 18 How. 272, 278, 15 L.Ed. 372. That means of enforcement was likewise provided in the Federal Act of 1798 imposing a direct tax on dwelling houses, land and slaves, 1 Stat. 597, 600. Other federal statutes, including the earliest one, 1 Stat. 29, 42, 46 (1789), which imposed import tariffs and duties on the tonnage of vessels, assured collection by means of bonds and forfeitures. Decisions upholding jury verdicts in suits on bonds to secure the payment of taxes, cited in Price v. United States, 1926, 269 U.S. 492, 46 S.Ct. 180, 70 L.Ed. 373, are of little assistance, since the statute provided that the suit should be at law. Because of the comprehensive scheme of remedies thus provided, the issue of the Government's power to sue in debt for the tax itself seldom arose. But when it did, the power was upheld, and the trial was to a jury, at common law. United States v. Lyman, supra. And the federal courts frequently stated, and several times held, that an action of debt lay to collect various federal taxes. E. g., Meredith v. United States, 1839, 13 Pet. 486, 10 L.Ed. 258 (holding; and the case had been tried to a jury); Dollar Savings Bank v. United States, 1874, 19 Wall. 227, 22 L.Ed. 80 (alternative holding; and the case had been tried to a jury); United States v. Chamberlin, 1911, 219 U.S. 250, 31 S.Ct. 155, 162, 55 L.Ed. 204 (alternative holding; cites also a statute which permitted tax collection by "any proper form of action," and which was also invoked in the Dollar case); Price v. United States, 1926, 269 U.S. 492, 500, 46 S.Ct. 180, 70 L.Ed. 373 (dictum, citing the bond cases and others, used as a basis for holding that "debt"

in the priority statute, Rev.Stat. § 3466, 31 U.S.C.A. § 191, includes taxes); United States v. Havner, 8 Cir., 1939, 101 F.2d 161, 165 (stating that no harm was done by trying the case in equity, since no one objected, but that it was properly an "action at law").

In summary, in 1791 an action of debt lay in England for the collection of taxes, such an action has always lain in the federal courts even apart from statute, and nothing in I.R.C. § 6502, providing that any seasonably assessed tax "may be collected by levy or by a proceeding in court," or in any other relevant statute, suggests that the "proceeding in court" was to be otherwise than the historic one. The claim against Bernard for his separate taxes is thus a suit at common law within the Seventh Amendment, for the right to jury trial exists in actions by the United States where it would in a similar action between private parties. 5 Moore, Federal Practice (2d ed. 1951) 229–32; The Sarah, 1823, 8 Wheat. 391, 5 L.Ed. 644; Connolly v. United States, 9 Cir., 1945, 149 F.2d 666; United States v. Jepson, D.C.D.N.J.1950, 90 F.Supp. 983.

No different conclusion is warranted because of the statement of Chief Justice Taft in Wickwire v. Reinecke, 1927, 275 U.S. 101, 105–106, 48 S.Ct. 43, 45, 72 L.Ed. 184, that:

"It is within the undoubted power of Congress to provide any reasonable system for the collection of taxes and the recovery of them when illegal, without a jury trial—if only the injunction against the taking of property without due process of law in the method of collection and protection of the taxpayer is satisfied. Murray's Lessee v. Hoboken Land and Improvement Co., 18 How. 272, 281, 282, 284 [15 L.Ed. 372], Nichols v. United States, 7 Wall. 122, 127 [19 L.Ed. 125]; Cheatham v. United States, 92 U.S. 85, 88, 89 [23 L.Ed. 561]."

Wickwire v. Reinecke was not an action by the Government to collect taxes; it was an action by a taxpayer against a collector for their recovery, in which a jury trial had been had. The quoted sentence followed an explanation that "the right of the petitioner to a jury in such a case is not to be found in the Seventh Amendment to the Constitution but merely arises by implication from the provisions of § 3226, Revised Statutes, which has reference to a suit at law"—an implication no plainer than that from I.R.C. §§ 6502 and 7401. Significantly the Chief Justice did not say that Congress could provide for the collection of taxes by a judicial proceeding having the form of a suit at common law without a jury trial, and none of the three decisions cited would have supported such a view. The Murray case upheld the legality of summary methods of collection of amounts due from a public officer alleged to be in default, against attack under the Fifth and Seventh Amendments and Article III. Although the Court discussed the summary methods for the collection of amounts due to the Crown, including taxes, both in England and in the colonies, and stated, 18 How. at page 277, "We apprehend there has been no period, since the establishment of the English monarchy, when there has not been, by the law of the land, a summary method for the recovery of debts due to the crown, and especially those due from receivers of the revenues,"[2] see also page 282, the opinion strongly implied that if Congress had chosen to proceed judicially, it would have been subject to all constitutional requirements applicable to the exercise of judicial power, at pages 283–285. The other two cases cited were refund suits against the government;

2. The opinion adds "It is difficult, at this day, to trace with precision all the proceedings had for these purposes in the earliest ages in the common law." This seems still to be true. It has also been said "The power to distrain personal property for the payment of taxes is almost as old as the common law." Springer v. United States, 1881, 102 U.S. 586, 593, 26 L.Ed. 253.

these "are not suits at common law within its [the Seventh Amendment's] true meaning," McElrath v. United States, 1880, 102 U.S. 426, 440, 26 L.Ed. 189; Galloway v. United States, 1943, 319 U.S. 372, 388, 63 S.Ct. 1077, 87 L.Ed. 1458. Neither does Mr. Justice Brandeis' opinion in Phillips v. C. I. R., 1931, 283 U.S. 589, 595, 597, 599, footnote 9, 51 S.Ct. 608, 611, 75 L.Ed. 1289, support the Government's claim. That case reiterated what is not here in dispute, "The right of the United States to collect its internal revenue by summary administrative proceedings," provided it allowed "eventual judicial review," and held that jury trial was not constitutionally required to be provided therein; again nothing was said as to jury trial when the Government, instead of proceeding summarily to collect its revenues, invokes the judicial power.

However, we need not here decide whether Congress could constitutionally provide for an action *in personam* to secure a judgment for taxes without a jury trial. Clear indication of an intention to do this would be required, yet nothing in the statutes is indicative of this. No basis for discerning an intent by Congress to limit the rights of taxpayers to jury trials in actions to collect taxes brought against them by the United States can be found in Congress' action in 1954, c. 648, § 2(a), 68 Stat. 589, amending 28 U.S.C. § 2402 to grant taxpayers that right when they sue the United States in the district court for a refund under 28 U.S.C. § 1346(a) (1); if any inference could be drawn, it would be to the contrary. To be sure, specific language was used; it had to be in order to overcome the specific prohibition of jury trials in such actions theretofore existing. The legislative history shows the House went along with the change, contrary to its earlier vote, only because of the illogic of denying the right to jury trial in the district court in a refund suit against the United States although it would exist—without benefit of specific statutory direction—in a suit against a collector, 83d Cong. 2d Sess., Conference Report No. 2276, U.S.Code Congressional and Administrative News, 1954, pp. 2720–2721. This extension of jury trial into an area where it was new to the tax field scarcely evidences an intention to withdraw it from an old one. Neither would we reach any different conclusion on the basis that, as said in Bull v. United States, 1935, 295 U.S. 247, 260, 55 S.Ct. 695, 700, 79 L.Ed. 1421, an assessment of taxes "has the force of * * * a judgment," see Pipola v. Chicco, 2 Cir., 1960, 274 F.2d 909, 911–913.[3] For actions on judgments likewise were in debt or, in some instances, contract. 2 Freeman, Judgments (5th ed. 1925), p. 2256; Chitty on Pleading, Vol. I, p. 125, Vol. II, p. 176.

II. *The prayers for establishment of the tax liens against Ollie's real property and sale of the property to satisfy them.*

At the opposite extreme from the claims against Bernard just considered lies so much of the complaint as seeks to establish the validity of the tax liens against Ollie's real properties and the sale of the properties to satisfy them.

■ Mr. Justice Story pointed out in Parsons v. Bedford, 1830, 3 Pet. 433, 446–447, 7 L.Ed. 732, that in view of the use of the phrase "all cases in law and equity" in Article III of the Constitution and the historic practice "that courts of equity use the trial by jury only in extraordinary cases, to inform the

---

3. Respondent's brief notes the Government's intention to request us, in O'Connor v. United States, Docket No. 26057, to give further consideration to some of the views expressed in the Pipola opinion, favorable to the Government's contention there, as to the nigh conclusive effect of a tax assessment when sued upon by the Government. Some basis for such a request is indicated by Clinkenbeard v. United States, 1874, 21 Wall. 65, 22 L.Ed. 477 and United States v. Rindskopf, 1882, 105 U.S. 418, 26 L.Ed. 1131, neither of which was called to our attention in Pipola. Any modification of Pipola in the sense suggested would only reinforce the ruling here.

conscience of the court," the natural conclusion from the reference ,to suits at common law in the Seventh Amendment is "that this distinction was present to the minds of the framers of the amendment" and that they did not intend the amendment to apply to proceedings "where equitable rights alone were recognized, and equitable remedies were administered."

■ Foreclosure of the mortgagor's equity of redemption was an established head of equity jurisdiction well before 1791, How v. Vigures, 1 Rep.Ch. 32, 21 E.R. 499 (1623); Emanuel College v. Evans, 1 Rep.Ch. 18, 21 E.R. 494 (1625); and this necessarily embraced the determination of the amount and validity of the mortgage debt. 1 Glenn, Mortgages (1943), 399–400. The more modern method of foreclosure through decree of sale, provided for United States tax liens by I.R.C. § 7403,[4] is sufficiently akin to the historic equity practice to preclude successful contention for a right to jury trial with respect to the ascertainment of the amount of the tax lien as against taxpayer's property and enforcement of the lien by sale. See 5 Moore, Federal Practice (2d ed. 1951), pp. 81, 109. United States v. Malakie, D.C.E.D.N.Y.1960, 188 F.Supp. 592. However, since the complaint discloses that only one of the liens was filed before the conveyances to Birns and Franz, this principle has little direct application in the instant case.

III. *The prayer that the conveyances to Birns and Franz be disregarded.*

■ An action by a judgment creditor or a trustee in bankruptcy to set aside a fraudulent conveyance has long been cognizable in equity, Hobbs v. Hull, 1 Cox Ch. 445, 29 E.R. 1242 (1788). Hence the Seventh Amendment is inapplicable to such a claim, Johnson v. Gardner, 9 Cir., 1949, 179 F.2d 114, certiorari denied 1950, 339 U.S. 935, 70 S.Ct. 661, 94 L.Ed. 1353; 5 Moore, Federal Practice (2d ed. 1951), p. 176, even though determination of the suit may involve the validity of the judgment as well as the circumstances of the conveyance. Any problem as to jury trial on this phase of the complaint arises from the fact that the United States has not yet recovered a judgment. See Scott v. Neely, 1891, 140 U.S. 106, 11 S.Ct. 712, 35 L.Ed. 358; American Surety Co. of New York v. Conner, 1929, 251 N.Y. 1, 166 N.E. 783, 65 A.L.R. 244.

■ Although F.R.Civ.Proc. 18(b) provides that "a plaintiff may state a claim for money and a claim to have

---

4. "§ 7403. Action to enforce lien or to subject property to payment of tax.

"(a) Filing.

"In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary or his delegate, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability.

"(b) Parties.

"All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.

"(c) Adjudication and decree.

"The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sales according to the findings of the court in respect to the interests of the parties and of the United States.

"(d) Receivership.

"In any such proceeding, at the instance of the United States, the court may appoint a receiver to enforce the lien, or, upon certification by the Secretary or his delegate during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."

set aside a conveyance fraudulent as to him, without first having obtained a judgment establishing the claim for money," this does not deprive the alleged debtor of a jury trial with respect to the money claim to which he would otherwise be entitled, Keene v. Hale-Halsell Co., 5 Cir., 1941, 118 F.2d 332, 335; 3 Moore, Federal Practice (2d ed.), p. 1832; see 1 Glenn, Fraudulent Conveyances and Preferences (Rev. ed. 1940), § 82, dealing also with the similar problem under the Uniform Fraudulent Conveyance Act. We need not determine whether, in some other type of case, a different result should follow because the money claim would become a lien once the allegedly fraudulent conveyance was set aside. For, without finding it necessary either to probe the precise meaning of the statement quoted from Wickwire v. Reinecke, or to decide exactly how far a tax assessment is conclusive when sued on by the government, see footnote 3, supra, such an assessment has at least sufficient kinship to a judgment, Bull v. United States, supra, that Congress, consistently with the Seventh Amendment, may extend to the United States the same rights to sue in equity to set aside a fraudulent conveyance that were held in 1791 by judgment creditors under the Statute of Elizabeth, 13 Eliz. 1, c. 5 (1571); and we read I.R.C. § 7403(c) as manifesting an intent to do precisely that. See Payne v. United States, 8 Cir., 1957, 247 F.2d 481, 484.

IV. *The claim for a personal judgment against Ollie.*

We shall first consider this problem as it would stand if the real properties were still in Ollie's name and then see whether any different conclusions are required because they are not.

Decisions and texts contain countless statements that, when the colonies separated from England, courts of chancery were without power to render a judgment for any deficiency that might remain unsatisfied after judicial sale of the mortgaged premises, see 3 Jones, Mortgages (8th ed. 1928), § 2206; Tedder v. Steele, 1881, 70 Ala. 347 (dictum, since held authorized by statute); Schnur v. Bernstein, 1941, 309 Ill.App. 90, 32 N.E.2d 675 (same); Jamaica Savings Bank v. M. S. Investing Co., 1937, 274 N.Y. 215, 8 N.E.2d 493, 112 A.L.R. 1485 (same). This supposed absence of power was thought to be an exception to the general principle of equity's granting full relief, Jamaica Savings Bank v. M. S. Investing Co., supra; 1 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 240. It was repeatedly stated that the procedure in England was to obtain a foreclosure of the equity of redemption in chancery and, either at the same time or thereafter, to bring a separate action at law to obtain judgment for any deficiency, e. g., 4 Kent, Commentaries (12th ed. 1873) *182–84; Dunkley v. Van Buren, 3 Johns.Ch., N.Y., 330 (1818); several British decisions permitted such a legal acion. E. g., Took's case, 2 Bro.C.C. 125, 29 E.R. 73, Dick. 785, 21 E.R. 476 (1784); Aylet v. Hill, Dick. 551, 21 E.R. 384 (1779). See 27 Halsbury, Laws of England (3d ed. 1959) 330–31. In any such action a defendant would, of course, be entitled to a jury trial. As a result of the absence of British precedents for a deficiency judgment in equity, it was held in New York and other states that there could be no deficiency judgment in a foreclosure suit, Dunkley v. Van Buren, supra; other cases are discussed in Young v. Vail, 1924, 29 N.M. 324, 222 P. 912, 34 A.L.R. 980. Consequently several states enacted statutes authorizing the entry of money judgments in foreclosure actions, 1 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 240, and the courts generally held no jury was required in trials under these statutes, Downing v. Le Du, 1890, 82 Cal. 471, 23 P. 202; Lindsey v. Porter, 1913, 140 Ga. 249, 78 S.E. 848; Carmichael v. Adams, 1883, 91 Ind. 526. See Note, 65 Harv.L.Rev. 453, 463 (1952). Contra, Clemenson v. Chandler, 1868, 4 Kan. 558; Ladd v. James, 1859, 10 Ohio St. 437, 438. In the federal courts, the Supreme

Court held equity had no power to enter a deficiency judgment, Noonan v. Lee, 1863, 2 Black 499, 67 U.S. 499, 17 L.Ed. 278; Orchard v. Hughes, 1864, 1 Wall. 73, 68 U.S. 73, 17 L.Ed. 560; then it immediately promulgated a rule of court authorizing such a judgment, see 1 Wall., p. vii, a statute permitted it in the District of Columbia, and federal equity courts began granting it in foreclosure suits, without jury trial. Shepherd v. Pepper, 1890, 133 U.S. 626, 652, 10 S.Ct. 438, 33 L.Ed. 706; Connecticut Mutual Life Ins. Co. v. Tyler, C.C.N.D. Ill.1878, 6 Fed.Cas. page 303, No. 3,109.

How this practice was to be reconciled with the doctrine applied in both federal and state courts, that equity was not to be expanded beyond its established boundaries so as to curtail constitutionally guaranteed rights of jury trial, received little attention until the remarkable opinion of Judge Botts in the New Mexico case of Young v. Vail, supra. This analyzed the authorities denying equity's power to render deficiency judgments, case by case, until it had traced every single one, save the two cryptic Supreme Court decisions, which cited no authority, to Chancellor Kent's decision in Dunkley v. Van Buren, supra. And that decision, Judge Botts showed, was wrong. In England, before the statute of 15 & 16 Vict., C. 86, § 48 (1852), a suit to foreclose was not a suit to have a judicial sale; it was simply a suit to establish the rights of the parties in a parcel of land, by "strict foreclosure." 3 Jones, Mortgages (8th ed. 1928), §

1960; 1 Glenn, Mortgages (1940), c. VIII; 3 Story, Equity Jurisprudence (14th ed. 1918), § 1372; Lansing v. Goelet, 1827, 9 Cow.,N.Y., 346. Since there was no sale, there was no determination of a deficiency to be made; title was declared in the mortgagee, and that was that. Therefore, there was no occasion for the chancery to consider whether it had power to enter deficiency judgments; and the absence of authority to that effect does not indicate a lack of power.[5] The only cases cited by Kent were those permitting a separate suit at law on the note. Since the issue of equity's power to enter a deficiency judgment in a suit to foreclose by sale was thus undecided by British precedents, reasoned Judge Botts, it should be resolved by general principles of equity jurisprudence. That meant application of the cleanup doctrine to avoid multiple litigation; and that, in turn, meant a deficiency judgment in equity. In fact, a few courts had upheld entry of a deficiency judgment without statute or court rule. Nolen v. Woods, 1883, 80 Tenn. 615; Gull River Lumber Co. v. Keefe, 1889, 6 Dak. 160, 41 N.W. 743.

We find this reasoning completely persuasive. Hence Ollie would not be entitled to a jury trial as to her personal liability if the properties were still in her name, 5 Moore, Federal Practice (2d ed. 1951), p. 306.

The argument that a different result is required here would be as follows: Ollie would be entitled to a jury trial of her personal liability, for the same

---

5. The few cases where sales were allowed are not sufficient to show otherwise. For example, when the mortgagor was an infant, and the value of the property exceeded the debt, this was done for his protection, e. g., Booth v. Rich, 1 Vern. 295, 23 E.R. 478 (1684?), followed in Mondey v. Mondey, 1 V. & B. 223, 35 E.R. 87 (1813); in such a case there could be no question of a deficiency. When the mortgagor was deceased, a sale was sometimes ordered, and in at least one case the decree provided that any deficiency be made up out of the mortgagor's personal estate, Daniel v. Skipwith, 2 Bro.C.C. 155, 29 E.R. 89 (1786).

In Dashwood v. Bithazey, Mosely 197, 25 E.R. 347 (1729), it was alleged that the security was "defective," and, although the Master of the Rolls knew of no precedent for a decree of sale, a sale was allowed "because the decree is, that the bill should be taken *pro confesso*." Since the decree of sale was considered questionable, since the mortgagor did not contest the prayer for relief, and since there was no request for a deficiency judgment, this case scarcely shows an absence of power in equity to render one.

The cases are collected in 3 Story, Equity Jurisprudence (14th ed. 1918), § 1372.

reasons as Bernard has been held to be, were it not that the *in personam* judgment is incidental to foreclosure of the tax liens and sale of property. However, there can be no foreclosure or sale unless the alleged fraudulent conveyances are set aside, and it is impossible to tell now whether they will be. Hence, would run the argument, her jury demand should not be stricken as regards the issue of her personal liability (save for the 1948 taxes, notice of lien as to which was filed before the conveyances) or, in the alternative, decision on the status of the jury demand in this respect should be deferred until the fraudulent conveyance claims have been determined.

■ We disagree. The right to a jury trial depends on the nature of the relief sought, not on what may ultimately be secured, 5 Moore, Federal Practice (2d ed. 1951), pp. 34–36. Moreover, such matters as are open with respect to the validity of the assessments and perhaps even their amounts will be in issue in the fraudulent conveyance claims, and we have held, in Section III, that I.R.C. § 7403 validly directed that such issues be tried to the court in an action to enforce the lien of a tax assessment, whether the action was against the taxpayer or any other persons "claiming an interest in the property involved." The adjudication having once been made by the court for that purpose, nothing will be left for a jury trial. Neither does the situation call for a prior jury trial on the issue of Ollie's liability under the ruling in Beacon Theatres, Inc. v. Westover, supra. There the right of the party demanding a jury trial was at least coordinate with that of the party seeking trial to a court; here Ollie has no right to a jury trial unless the government loses its court-triable claim involving the identical issue.

V. *The claim for a personal judgment against Bernard on his joint liability with Ollie.*

■ Modern texts state that a third party liable as co-maker or endorser of a secured obligation may be joined in an action to foreclose a mortgage, although he owns no interest in the property. 1 Glenn, Mortgages (1943) § 78; 3 Jones, Mortgages (8th ed. 1928) §§ 1780, 1820–23. In a great many states suit joinder is now permitted as an incident of equitable jurisdiction. Averyt Drug Co. v. Ely-Robertson-Barlow Drug Co., 1915, 194 Ala. 507, 69 So. 931; Hubbard v. University Bank of Los Angeles, 1899, 125 Cal. 684, 58 P. 297; North End Bank & Trust Co. v. Mandell, 1931, 113 Conn. 241, 155 A. 80; Hansen v. Bowers, 1929, 208 Iowa 545, 223 N.W. 891; Miller v. McLaughlin, 1903, 132 Mich. 234, 93 N.W. 435; Meehan v. First Nat. Bank of Fairfield, 1895, 44 Neb. 213, 62 N.W. 490; Jarman v. Wiswall, 1873, 24 N.J. Eq. 267; Jamaica Savings Bank v. M. S. Investing Co., 1937, 274 N.Y. 215, 8 N.E.2d 493, 112 A.L.R. 1485; Fond du Lac Harrow Co. v. Haskins, 1881, 51 Wis. 135, 8 N.W. 15. But in all these cases a statute empowered the equity court to enter deficiency judgments against the mortgagor and others liable on the obligation, and many said this was essential since equity was thought to have had no such power in England in 1791. Tedder v. Steele, 1881, 70 Ala. 347; North End Bank & Trust Co. v. Mandell, supra; Jamaica Savings Bank v. M. S. Investing Co., supra; 3 Jones, Mortgages § 2209. In the absence of statute several courts, supported by dicta in two English decisions, Audsley v. Horn, 26 Beav. 195, 53 E.R. 872 (1858); Geyde v. Matson, 25 Beav. 310, 53 E.R. 655 (1858), dismissed a third party obligor from a foreclosure suit on the ground of multifariousness or misjoinder. Van Sant v. Duval Cattle Co., 1934, 116 Fla. 159, 156 So. 369; Schnur v. Bernstein, 1941, 309 Ill.App. 90, 32 N.E. 2d 675; Doan v. Holly, 1857, 25 Mo. 357; Borden v. Gilbert, 1861, 13 Wis. 670.

However, Judge Botts' opinion in Young v. Vail, supra, necessarily brings into question these statements and decisions concerning joint obligors, just as it did in the case of the mortgagor alone. The reason for the absence of eighteenth

century English authority for equity's entering a deficiency judgment against a joint obligor on a mortgage foreclosure is as likely to be the accident that the question would not arise in strict foreclosure as a view that the equity cleanup doctrine ought not be extended so far, and the American authorities seem based on the lack of English precedent. The readiness of American courts to permit equity to enter deficiency judgments against parties other than the mortgagor after the enactment of authorizing legislation, despite constitutional protection of jury trial, is strong evidence that such judgments were not beyond the true scope of equity's power in 1791, exactly as is the similar readiness to enter deficiency judgments against the mortgagors themselves. Moreover, at least one court, relying upon the cleanup doctrine and without a statute, did permit the entry of a money judgment against a joint obligor or surety who was not a party to the mortgage, Sarasota Ice, Fish and Power Co. v. Lyle & Co., 1907, 53 Fla. 1069, 43 So. 602, and Story, Equity Pleadings, 280, 462, discussing the general principles of joinder of defendants in equity, stated that all could be joined who shared a "common liability," giving as an example a suit against A and B for an accounting owed by both, and to foreclose a lien for the liability against A alone. Such joinder was permitted in Manners v. Rowley, 10 Sim. 470, 59 E.R. 697 (1840).

We believe therefore that the basic principles of equity as recognized in 1791 would have permitted the joinder, in a suit for foreclosure, of a joint debtor not having an interest in the land and the rendition of a deficiency judgment against him, or, that, at the very least, it would not be an unreasonable expansion of equity jurisdiction for Congress to permit this, see 5 Moore, Federal Practice (2d ed. 1951), § 38.08 [5]–4. I.R.C. § 7403 sufficiently indicates Congressional purpose to that end.

Accordingly the petition for mandamus is granted with respect to the claims asserted solely against Bernard Damsky and is otherwise denied.

CLARK, Circuit Judge (dissenting in part).

I dissent from so much of the opinion and judgment as grants a jury trial on the peripheral tax claims asserted solely against Bernard Damsky. In accordance with the precedents, as well as reason and policy, I find the question to be one purely of statutory intent, not of constitutional right. And since Congress —which has shown an ability to speak clearly on the issue when it so chooses [1] —has conspicuously refrained from stating a requirement of trial by jury in this area of tax collection, I would hold Judge Zavatt correct in denying all jury trial demands in his decision below, D.C.E.D. N.Y., 187 F.Supp. 404. See also Judge Bartels' ruling in United States v. Malakie, D.C.E.D.N.Y., 188 F.Supp. 592.

The very careful and learned research by my brother Friendly into the history of the English Court of Exchequer beginning with the twelfth century serves in its fascinating, if uncertain, detail to highlight the artificiality of the chain of reasoning by which this restriction on twentieth century tax collection is discovered. The nub of the decision is the ruling that there is a constitutional right to a jury in the taxing area thus delimited. For the absence of any suggestion of the restriction in any Congressional enactment precludes its support on merely statutory grounds. Indeed, the extensive discussion in the remainder of the opinion finding no jury right as to the other claims involving the other defendants—including the claim for a personal

---

1. Thus 28 U.S.C. § 2402, which required trial to the court without a jury of all actions against the United States under 28 U.S.C. § 1346, was amended in 1954, 68 Stat. 589, to provide for a jury trial at the request of either party in actions under 28 U.S.C. § 1346(a) (1), i. e., actions for tax refunds. In consequence a taxpayer may have the benefit of a jury by paying his assessment and suing for a refund.

judgment against Ollie and, even more strikingly, the claim for a personal judgment against Bernard on his joint liability with Ollie—shows conclusively the lack of any ground for the decision short of the constitutional right. True, I would have reached these results more directly and simply than does the opinion; moreover, I believe the discussion there had goes far to demonstrate the fallacy of the reasoning indulged in as to the personal claims against Bernard. But in any event it does show conclusively the absence of any supporting statute.

So we are driven to the issue of constitutional right. But here, too, there are serious difficulties, general and specific, in the result reached. At the outset there are to be overridden the precedents clearly stating it to be "within the undoubted power of Congress to provide any reasonable system for the collection of taxes and the recovery of them when illegal, without a jury trial—if only the injunction against the taking of property without due process of law in the method of collection and protection of the taxpayer is satisfied." This explicit statement of Chief Justice Taft in Wickwire v. Reinecke, 275 U.S. 101, 105–106, 48 S.Ct. 43, 72 L.Ed. 184, is amply supported by the cases he cites, as it seems to me the analysis of them in my brothers' opinion actually demonstrates.[2] Perhaps even more emphatic is the opinion of Justice Brandeis in Phillips v. C. I. R., 283 U.S. 589, 595, 599 note, 51 S.Ct. 608, 612, 75 L.Ed. 1298, upholding the right of the United States to collect its revenue by summary administrative proceedings, with right of review by the Board of Tax Appeals and the courts: "The further objection that this mode of review may

deprive the taxpayer of a jury trial contrary to the Seventh Amendment, is unfounded." See also 1 Davis, Administrative Law Treatise 594, 595 (1958). And of course actual and uniform practice is worth more than volumes of remote history or abstract theory.

Next we must consider the extensive statutory remedies. The preferred methods of income tax collection are now obviously through the broad and all-inclusive property lien of I.R.C.1954, § 6321—valid against the taxpayer himself without formal filing of notice, id. § 6323, and enforced by district court action under id. § 7403—and the increasingly popular (Congress-wise) withholding tax or collection at the source, see, e. g., id. §§ 31–32, 1441, 3402, which seems likely soon to be extended to additional sources of revenue. Clearly these methods do not set boundaries to the government's power to insure effective collection of the revenue. For the statutes definitely provide that a duly imposed tax "may be collected by levy or by a proceeding in court," id. § 6502, which is elsewhere referred to broadly as a "civil action," id. § 7401, while the district courts are given jurisdiction, *inter alia*, to render such judgments in "civil actions * * * as may be necessary or appropriate for the enforcement of the internal revenue laws," id. § 7402. These broad and expanding concepts—not in any way limited to the ancient writ of debt—suggest the wide sweep of the government taxing power with which the implication of hidden restrictions is entirely inconsistent.[3]

To reach the conclusion that the Seventh Amendment does restrict tax gathering in this one limited area—i. e., where

---

2. Wickwire v. Reinecke, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184, was actually a tax-refund suit, where the holding (necessary to decision of the procedural point at issue) was that the jury right was granted by statute and not by the Constitution. Cf. note 1 supra for later developments of the rule.

3. Various cases are cited which are thought to give some support—rather

faint at best—to this matter of labeling; but they do not deal with the jury issue, and since in general they are permissive, rather than restrictive, I believe them rather to support the view I have taken than the opposite. See, e. g., United States v. Havner, 8 Cir., 101 F.2d 161, 165, and Price v. United States, 269 U.S. 492, 500, 46 S.Ct. 180, 70 L.Ed. 373, and compare also Pipola v. Chicco, 2 Cir., 274 F.2d 909.

the taxpayer has neither wages nor property—my brothers must resort to a technique which I must concede is not uncommon to lawyers, but which I do suggest would seem strange to any but lawyers. For first they must attach to this single form of claim an inapt label, namely, that of the writ of debt, and next, having made this venture in nomenclature and having further found on somewhat uncertain history that the writ always required a jury, they must hold that the name draws the action irrevocably into the constitutional aegis. I believe each of these steps to be quite unreal and unjustified. The modern all-inclusive civil action under the federal rules does not look like the old writ of debt, as set forth, say, in Chitty; and the attempt so to confine its broad terms seems to me at variance with the obvious intent of Congress to provide the widest remedial actions possible for tax collection. And even if by a strain upon history we now give it this limited name, that does not change the fact that the action is one *by the sovereign* to *collect its taxes* where the claim that a jury trial is constitutionally required has been authoritatively held "unfounded." The result seems, therefore, to be one of logistic bootstrap lifting; it justifies my brothers' apology that their discussion "may seem to reek unduly of the study" or, I would add, "if not of the museum."

Of course American lawyers and judges have found the jury of immense value in assuming the burden of adjudicating troublesome issues of fact, notably in criminal and in negligence cases. But it is not showing care for the jury to force it into classes of claims where the right is dubious and the use inconvenient and burdensome. The present strain on juries in the cases where it is most needed is such that true believers should pause before they push it too far. The delays and court congestion of the jury calendars are a source of increasing tension, the long waits and infrequent sittings are a burden to the conscientious juror and lead him increasingly to avoid service, and Congress is regularly objecting to what it considers the undue cost of juries and cutting the appropriations therefor. And the actual inconvenience to adjudication by a rigid rule such as here announced is obvious. The claims made against Bernard, who has no property upon which the levy may be made, presumably are the least important of any before the court; and he was doubtless included both to foreclose any possible interest he might have in his wife's property and to prevent his later assertion of *res judicata* against other claims. And yet the very lack of substantial value to his case gives him alone a constitutional right of trial by jury and the power to condition and shape the entire litigation. Surely this is anomalous. Surely, too, the reasoning to that end is not sufficiently compulsive to be accepted as the only one possible in the premises. The result reached below seems more consistent with a modern age and a modern procedure, and so I would deny the petition *in toto*.