**FARMERS–PEOPLES BANK, Plaintiff-Appellant, Cross-Appellee,**

**v.**

**UNITED STATES of America, Defendant-Appellee, Cross-Appellant.**

**Nos. 72–1856, 72–1857.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 5, 1973.

Decided April 30, 1973.

2. Boys Markets, Inc. v. Local 770, Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed. 2d 199 (1970).

John F. Kizer, Milan, Tenn., for appellant, cross-appellee.

Charles R. Burnett, Tax Div., Dept. of Justice, Washington, D. C., for appellee, cross-appellant; Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Crombie J. D. Garrett, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief; Thomas F. Turley, Jr., U. S. Atty., Memphis, Tenn., of counsel.

Before PHILLIPS, Chief Judge, and EDWARDS and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This appeal involves the claim of the plaintiff, Farmers-Peoples Bank of Milan, Tennessee (the bank) against the defendant, United States (the government) pursuant to 26 U.S.C. § 7426(a)(1) for an alleged wrongful levy by the government on the assets of the Clemmer Building Supply Company (C. B.S.), now bankrupt. The government counterclaimed under 26 U.S.C. § 3505(b), which imposes personal liability on lenders under certain conditions. The district court for the Western District of Tennessee partially granted the relief sought by each party. The plaintiff has appealed and the government has cross-appealed.

C.B.S. ran a lumber shed and was a home contractor in Milan, Tennessee. On October 7, 1968, its Board of Directors authorized its president, Hubert Clemmer, Jr., to apply for a loan up to $50,000 from the bank. The district court found that on October 10, 1968, the bank loaned C.B.S. $35,000. In return Clemmer signed a promissory note and a security agreement, granting the bank a security interest in C.B.S.'s assets (notably accounts receivable and inventory).

The security agreement was lost. At the time of the agreement C.B.S. carried two accounts with the bank, one a general checking account and the other a payroll account. It was the bank's practice to allow C.B.S. to overdraw these accounts regularly. The bank's records reflect that $32,000 of the loan made in 1968 was transferred to the payroll account to cover the existing overdrafts in that account. On October 23, 1968, the bank filed a financing statement with the Secretary of State of Tennessee, reflecting the indebtedness of C.B.S. and the bank's security interest. By December 19, 1969, payments by C.B.S. had reduced the outstanding balance on the note to $19,832.76. At this time Clemmer signed for C.B.S. a "renewal" promissory note.

The bank was represented in these transactions by John McNail, the bank's executive vice president. McNail personally approved the payment of checks drawn by C.B.S. that actually overdrew C.B.S.'s accounts. In 1968, C.B.S.'s financial condition worsened. Yet it regularly overdrew its checking accounts, often for large amounts. In 1970, it was forced into involuntary bankruptcy. At the time of the bankruptcy, the bank was carrying over $47,000 in overdrafts.

During the fourth quarter of 1968, the third and fourth quarters of 1969, and the first quarter of 1970, C.B.S. incurred federal tax liabilities for withholding and unemployment taxes. On three occasions C.B.S. attempted to pay these taxes but the checks were dishonored by the bank because of insufficient funds. Finally, in early 1970, Clemmer paid the Internal Revenue Service a part of C.B.S.'s tax liability with a cashier's check in the amount of $8,051.30. On February 24, 1970, and April 23, 1970, the government filed two tax liens for $14,111.73, and $7,554.82, respectively, totaling $21,666.65. On March 4, 1970, the government foreclosed on these liens, locking the doors of C.B.S. The government proceeded to collect some of C.B.S.'s accounts receivable and attempted to sell its assets at public sale. The sale drew no bidders and the government released the assets to Clemmer. The bank then asserted its security interest. An accord was reached between the bank and the government, providing that the assets would be sold free of their respective interests, the proceeds of the sale to be placed in an escrow fund pending judicial determination of priorities. The later sale netted $21,601.18.[1] Subsequently a rent account in the amount of $1,137.50 was seized by the bank.[2] On August 14, 1970, C.B.S. was declared bankrupt. The bankruptcy court released the property of the bankrupt to the bank subject only to the rights of the federal government, if any, under its tax liens.

The district court found that the bank had a security interest arising from the lost 1968 agreement, limited to $19,832.-76,[3] with respect to:

All inventory of every nature and kind now on hand and all hereafter acquired inventory, along with all ac-

---

1. The district court in its amended order found that this escrow fund contained some $5,650.50 derived from the sale of C.B.S.'s equipment. Originally this amount was not included in the escrow fund, but was assumed to have been independently collected by the bank. According to the court's amended order this assumption was in error, and this amount was found to have been included in the escrow fund. The government did collect two items independently of the escrow fund, $454.28 (cash from C.B.S.'s register at the time of seizure) and $3,350.00 (proceeds realized from the sale of C.B.S.'s vehicles). The bank does not claim an interest in these two items.

2. This account is later referred to by the district court as containing $1,300.00. The difference is apparently represented by interest.

3. Subsequent to the filing of the tax liens, the bank sought to convince the government that the original security agreement had actually been executed and that it contained a future advances clause, securing the bank for advances up to $50,000.-00. Pursuant to this purpose, Clemmer came to McNail's office and signed a

counts receivable, now held or hereafter acquired accounts receivable, along with office supplies, machines, and tools and equipment usual and incidental to the operation of a lumber shed.

It was then held that the bank's interest in this amount was superior to the government's tax liens, except as to the 26 U.S.C. § 3505(b) liability. From the amount of $19,832.76 the court subtracted $1,300.00 [4] (rent account) and $5,650.-50 (proceeds from the sale of equipment). These monies were thought to have been collected independently of the escrow fund. Consequently, the bank's security interest in the proceeds from the sale of C.B.S.'s assets held in the escrow fund was reduced to $12,882.26, or, with interest, to $14,341.23. The court then held that the bank was liable under 26 U.S.C. § 3505(b)[5] as to the fourth quarter of 1969 because of loans made to C.B.S. during that period, a liability fixed at $5,763.81. This amount was also subtracted from the bank's share of the escrow account, finally leaving the bank's portion at $8,577.42. The government was awarded the remaining amount, or $13,023.76 ($5,763.81 under 26 U.S.C. § 3505(b), and $7,259.95 under its tax liens).

To complicate matters further the court amended its findings. In its amended order the district court held that the $5,700.00 (listed above as $5,650.50) was in fact included in the escrow fund. Consequently this amount was added to the bank's share of the fund and subtracted from the government's portion, thus giving the bank $14,277.42 and the government $7,323.76 from the escrow fund. Also each party was allowed to retain the proceeds from the sale of assets that it had sold independently of the escrow fund.

Upon consideration we are satisfied that all of the findings and conclusions of the district court are correct except its denial of the bank's demand for a jury trial on the 26 U.S.C. § 3505(b) issues as to both the third and fourth quarters of 1969, and with the possible exception of the common law lien question noted below.

The Seventh Amendment to the federal Constitution provides:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise

"duplicate agreement." The form was blank when Clemmer signed it, except that it indicated an indebtedness of $35,000 and was marked "duplicate." McNail then filled in the form, including a future advances clause for amounts up to $50,000. Also, McNail filed an affidavit with the court that the original agreement did in fact contain a future advances clause. Clemmer testified that he could not remember whether the original contained such a provision. The court found that the bank did not carry its burden of proof on this issue, and that the original security agreement did not contain a future advances provision. We hold that this finding was not clearly erroneous.

4. *See* note 2, *supra.*

5. 26 U.S.C. § 3505(b) provides:
   (b) *Personal liability where funds are supplied.*—If a lender, surety, or other person supplies funds to or for the account of an employer for the specific purpose of paying wages of the employees of such employer, with actual notice or knowledge (within the meaning of section 6323(i)(1)) that such employer does not intend to or will not be able to make timely payment or deposit of the amounts of tax required by this subtitle to be deducted and withheld by such employer from such wages, such lender, surety, or other person shall be liable in his own person and estate to the United States in a sum equal to the taxes (together with interest) which are not paid over to the United States by such employer with respect to such wages. However, the liability of such lender, surety, or other person shall be limited to an amount equal to 25 percent of the amount so supplied to or for the account of such employer for such purpose.

reexamined in any Court of the United States, than according to the rules of the common law.

This Amendment is in essence embodied in Rule 38(a) of the Federal Rules of Civil Procedure:

> (a) *Right Preserved.* The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate.

The Seventh Amendment preserves to litigants the right to jury trial in suits at common law—

> not merely suits, which the *common* law recognized among its old and settled proceedings, but suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered . . . .

Ross v. Bernhard, 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed.2d 729 (1970), quoting Parsons v. Bedford, 28 U.S. (3 Pet.) 433, 437, 7 L.Ed. 732 (1830). The difficulty of course is to distinguish the legal from the equitable claims.

Since the merger of law and equity, the doctrine that a court in equity, once it has jurisdiction, will adjudicate both legal and equitable claims sitting without a jury, has been drastically eroded. This is due to the liberal joinder provisions under Rule 18 of the Federal Rules of Civil Procedure. Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 509–510, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

As the Supreme Court has stated:

> where equitable and legal claims are joined in the same action, there is a right to jury trial on the legal claims which must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims. The Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action.

Ross v. Bernhard, 396 U.S. 531, 537–538, 90 S.Ct. 733, 738 (1970). Dairy Queen, Inc. v. Wood, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); Beacon Theaters v. Westover, 359 U.S. 500, 505, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

In *Ross* the Court pointed to three factors to be considered in making the distinction between legal and equitable claims.

> As our cases indicate, the "legal" nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries. Of these factors, the first, requiring extensive and possibly abstruse historical inquiry, is obviously the most difficult to apply.

Ross v. Bernhard, 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 738. *See* Simler v. Conner, 372 U.S. 221, 223, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963).

In Damsky v. Zavatt, 289 F.2d 46 (2nd Cir. 1961), the Court held in a well-reasoned opinion that an action *in personam* to recover taxes was one recognized at common law as an action on a debt, a legal cause of action for which a jury trial was appropriate. On the basis of this authority the first prerequisite for a jury trial is met.

There are three essential elements of an action pursuant to § 3505(b) upon the facts of this case. First, the bank must have loaned money to C.B.S. with the knowledge that the money was to be specifically used to meet C.B.S.'s payroll during the third and fourth quarters of 1969; second, C.B.S. must have failed to pay its withholding and unemployment taxes during these quarters and the taxes must still be outstanding; and third, the bank must have had actual notice or knowledge that C.B.S. neither intended nor was able to pay its payroll taxes. In our opinion no characterization of this cause of action could be made other than an action on a debt to impose personal liability.

The recovery of the debt against the bank under § 3505(b) could exist regardless of the existence of the escrow fund or of the tax liens. Hence, the second requirement of *Ross,* i. e. the remedy, is satisfied.

The third factor listed by *Ross,* the practical abilities and limitations of juries, should present no difficulties here. The central issue for the jury would be the bank's actual notice or knowledge [6] of the employer's intent not to pay or its inability to pay its payroll taxes. This question is peculiarly appropriate for jury resolution. Moreover, the § 3505(b) issues are easily severable from the other issues raised in the action. These issues as to both the third and fourth quarters of 1969 should be submitted for jury determination.

The bank asserts that it is entitled to set-off the amount recovered from the rent account against C.B.S.'s outstanding liability. Apparently the bank is arguing that this right is a common law one and therefore takes precedence over a federal tax lien. *See* Tenn.Code Ann. § 47–9–310 (1964). The district court did not specifically pass on this issue. By inference, however, the court held that the bank had no such right, since the court subtracted the amount in the rent account from the bank's secured interest. Wagner v. Citizens Bank & Trust Co., 122 Tenn. 164, 122 S.W. 245 (1909), casts some doubt on this result. In that case the court, albeit by dictum, apparently recognized such a common law right in Tennessee. *See also* Comment 1, Tenn.Code Ann. § 47–4–208 (1964). We express no opinion on this question since we feel that it should be specifically dealt with by the district court on remand. We observe, however, that the finding that the original securi-

ty agreement did not contain a future advances clause is not dispositive of this issue because the bank still has outstanding over $47,000 in overdrafts.

Other questions have been raised by both parties on appeal but have been found to be without merit.

Modified and remanded for further proceedings not inconsistent with this opinon.

---

6. 26 U.S.C. § 6323, as rewritten by § 101 (a), Federal Tax Lien Act of 1966, defining "notice" or "knowledge" for purposes of § 3505(b), provides in part:
    (i) *Special Rules.*—
    (1) *Actual notice or knowledge.*— . . . . an organization shall be deemed for purposes of a particular transaction to have actual notice or knowledge of any fact from the time such fact is brought to the attention of the individual conducting such transaction, and in any event from the time such fact would have been brought to such individual's attention if the organization had exercised due diligence.